No. 32,405

DAN HENDREN, by C. HENDREN, His Father and Next Friend, *Appellee*, v. LELA SNYDER, otherwise known as MRS. L. M. SNYDER, *Appellant*.

(53 P. 2d 472)

Opinion filed January 25, 1936.

*Robert C. Foulston, George Siefkin, Sidney L. Foulston, Lester L. Morris, George B. Powers, C. H. Morris, Carl T. Smith,* all of Wichita, *W. H. Schwinn* and *H. W. Goodwin,* both of Wellington, for the appellant.

*E. J. Taggart, John Bradley* and *John Potucek,* all of Wellington, for the appellee.

The opinion of the court was delivered by

HARVEY, J.: This was an action for damages for personal injuries sustained in an automobile casualty alleged to have been caused by the negligence of defendant. The jury answered special questions and returned a verdict for plaintiff for $8,000. The defendant has appealed. We shall speak of the parties as they appeared in the trial court.

While several questions are argued on the appeal, we find it necessary to consider but one of them, namely, Was there sufficient evidence to sustain the verdict? The facts may be stated as follows: U. S. highway 81, an arterial state highway, enters the city of Caldwell from the east. It carries a heavy vehicular traffic. It is paved with a cement slab eighteen feet wide, with a black line in the center, and has dirt shoulders four feet wide on each side of the slab. A short distance east of the city limits there is a bend in the highway commonly spoken of as an S curve. Within a mile or so east of the city limits there are a number of residences, a dozen or more, facing the highway, some on the north side and some on the south. There is quite a little pedestrian travel along this highway. Just within the city limits there is a filling station on the north side of the highway. Plaintiff's home is with his parents in New Mexico, but at the time of the casualty he was staying with relatives who lived a mile east of Caldwell on the south side of the highway, and was attending high school in Caldwell. He ordinarily walked back and forth to high school and frequently "thumbed" a ride with some motorist. The evening of February 15, 1933, he left the place where he was staying to go into Caldwell to attend a meeting of high-school students. He walked across the highway and west along the north shoulder toward Caldwell. He was dressed in a blue serge suit with a dark topcoat, which had a high collar, without a hat, and was carrying a bundle in his hands. The shoulder of the highway was described as being dry, but there had been moisture from rain or snow a few days before and as he walked along the shoulder he got some mud on his shoes. The air was chilly, a breeze was blowing, and to protect himself from it he raised the collar of his topcoat and pulled his head down. He was watching out to catch a ride, and as cars approached him from the rear he turned, faced the south, and stepped up on the edge of the cement slab to "thumb" a ride. As many as three, perhaps five, cars had passed him without picking him up. He had walked to within a quarter of a mile of Caldwell, and was near the S curve when he heard a car approaching from the east. He did not see that it had any lights—in fact, he testified it had no lights. He turned to the south, looked and saw a car approaching from the east within a few feet of him. He was struck and thrown to the side of the pavement and sustained severe injuries. The most serious of these resulted from the fact that his head came in contact with the

handle on the door of the car. This appeared to have struck him from in front, near the top of his head, just above the hair line and a little to the right of the center, breaking a hole in the skull and causing severe injuries, some of which are permanent. The impact broke the handle off the door of the car, which later was found in several pieces near where he lay. This happened about 6:45 o'clock in the evening, which was about an hour after sunset. A few minutes after the casualty a motorist, driving into Caldwell from the east, observed his body lying on the shoulder near the pavement. He went to the filling station and described what he had seen to the attendant there, and together they went back and found plaintiff, who was then lying stretched out on the shoulder of the highway parallel to the pavement, about six inches from the edge of it. They also found parts of the broken door handle of the car. Plaintiff was asked if a car hit him and he said "Yes." He was asked which way it came from and he said it was coming from the east. Plaintiff was taken to the hospital, where he was treated for his injuries.

Defendant and her husband, who was an employee of the telephone company and whose work had taken him away from home that day, lived in an apartment at Caldwell. A Mrs. Randall and her husband lived in an apartment on the same floor. The two women were good friends and spent much time together. A Mr. Moore also lived in the same apartment house, and was well acquainted and on friendly terms with defendant and her husband and with Mr. and Mrs. Randall. The afternoon of February 15 defendant and Mrs. Randall were spending the time together, and sometime in the afternoon concluded to drive to Wellington, twenty-eight miles, and back, simply for the ride. Defendant had a Buick coupé, 1928 model, which she drove. They drove to Wellington, and without getting out of the car there turned and drove back to Caldwell at a speed of 35 to 40 miles per hour. They got back to their apartments about seven o'clock. As they were coming into Caldwell from the east defendant had the lights burning on her car. Near the S curve they met a car coming from the west. Defendant was driving and kept close watch of the black center line of the highway. Neither the defendant nor Mrs. Randall saw the plaintiff, nor did they notice any impact on their car, or anything else to indicate that they had struck anything or anybody. After being at their apartment perhaps fifteen or twenty minutes they went down to defendant's car to go to a restaurant for supper. As Mrs. Randall

was getting into the car from the right-hand side she noticed the handle was gone from the door and called defendant's attention to it. This provoked some comment as to its loss. Mrs. Randall's husband would be home at nine o'clock. After defendant and Mrs. Randall had eaten supper ·they concluded to drive till near that time. In doing so they drove about town and east on U. S. highway 81 a mile or more to a cross road, where they turned around and drove back into town. In turning at the cross road Mrs. Snyder backed her car too far into a ditch where there was mud and her car got stuck. Passersby helped her to get out. They went to their apartment about nine o'clock. After Mr. Randall came in defendant, Mr. Moore and Mr. and Mrs. Randall played bridge until nearly midnight. Sometime late in the evening Mr. Moore spoke of plaintiff's having been injured by an automobile and stated the only clue as to the car which struck him was broken pieces of the handle of a car door found near him. This reminded defendant and Mrs. Randall of the fact that the handle was missing from the right door of defendant's car, and the possibility that her car might have struck plaintiff was discussed. From the evidence this is the first defendant had any intimation that her car had struck plaintiff. The broken pieces of the handle of the car door found near the plaintiff soon after his injury were put together and they fitted defendant's car. At the trial it was in effect conceded defendant's car is the one that struck plaintiff. Witnesses who examined the shoulder of the highway where plaintiff was found and near there, some of them that night and some early the next morning, were unable to find any tracks of the tires of an automobile on the shoulder of the highway, although the shoulder was sufficiently moist that the tracks of persons who walked there were plainly seen. The tires of the car would have left a track had they passed over the shoulder of the highway.

The jury answered special questions as follows:

"1. At what rate of speed was the defendant's automobile moving immediately prior to the accident? A. Forty miles per hour.

"2. Did the defendant see the plaintiff immediately prior to the accident? A. No.

"3. Where did the accident occur with reference to the edge of the paved slab?· A. Shoulder close to edge of slab.

"4. Were there two lighted headlights on defendant's automobile at the time of the accident? A. Yes.

"5. What, if any, negligence do you find as against the plaintiff? A. None.

"6. What, if any, negligence do you find as against the defendant? A. Failure to anticipate presence of pedestrians on the highway and to keep a lookout for pedestrians."

The answer to the seventh question itemized the amount of the verdict.

Defendant's motion to set aside the answers to special questions 3, 5, 6 and 7 for the reason that they were not sustained by the evidence was overruled. The answer to special question No. 3 apparently was not construed as a finding that defendant's car was driven off the slab and onto the shoulder of the highway. If it were so construed there is no evidence in the record to sustain it, and it should have been set aside. If it is construed as meaning that the casualty occurred near the edge of the slab where it meets the shoulder of the highway, it is sustained by the evidence.

Appellant further contends that the answers to special questions 5 and 6 are not founded upon any substantial evidence, but are based upon speculation and conjecture; and further, that the answer to question No. 6, as it applies to the facts in this case, is not a finding of negligence of defendant which will support the verdict. We find no evidence in the record that defendant failed to keep a lookout for pedestrians, or to anticipate their presence on the highway. Appellant argues this finding of the jury could be arrived at only by arguing backwards, thus: Plaintiff was struck by defendant's automobile; defendant did not see him prior to the time she struck him, therefore she failed to anticipate his presence on the highway and to keep a proper lookout for him. Plaintiff answers this argument by saying that even if the finding were arrived at in that way it is logical. But that does not necessarily follow. It would have been just as reasonable and as logical under the evidence for the jury to have found that when plaintiff, walking along the shoulder of the highway, heard defendant's car approaching from behind him he turned, faced the south, as he testified, and stepped up on the edge of the pavement, as he testified was his custom, and stood or leaned so near the car as to be struck by it.

In support of the view that the answer to question No. 6 is a finding of negligence of defendant upon which the verdict in this case could be based, quotations are made from several of our cases respecting the duty of the driver of an automobile to anticipate pedestrians or other vehicles on the highway and to keep a lookout for them. The earliest of these cited is *Arrington v. Horner*, 88 Kan.

817, 129 Pac. 1159. In that case the driver of the automobile along a dirt road overtook a four-horse team and wagon, and in front of that a two-horse team and wagon, with a saddle horse tied to the side. The driver of the automobile turned to the right to go around these teams. He passed the four-horse team without incident, but in passing the other team the saddle horse suddenly got in front of the automobile and was injured. In the action for recovery of damages to the saddle horse judgment was.for defendant. This was affirmed. It was held the driver of an automobile, when meeting or passing persons driving or riding domestic animals, shall exercise the care and caution to prevent injury and insure safety which a reasonably prudent person would exercise, taking into consideration all the elements of the situation, including the appearance and attributes of his peculiar kind of vehicle; that a corresponding duty rests upon a person riding or driving the domestic animal, and that it is the duty of a driver on the public highway, whether of an automobile or of domestic animals, to look ahead and see whatever there may be in the line of his vision which would affect his driving. It is pointed out in the opinion that the statute being considered "did not make the automobile driver an insurer." Plaintiff also cites *Giles v. Ternes*, 93 Kan. 140, 144, 143 Pac. 491. That case came to this court to review a judgment for defendant on his cross petition. Plaintiff was driving an automobile west on a country road. Defendant was driving a horse hitched to a buggy, going east. The highway was eighteen feet wide and both were using the beaten track; it was after dark; the vehicles collided; each blamed the other. The judgment was affirmed. The court held it is the duty of a motorist to keep a vigilant watch ahead for other vehicles as well as pedestrians on the highway, and lights are required to enable him to see persons and vehicles on the highway in time to avoid them. Plaintiff also cites *Kelly v. Vucklich*, 111 Kan. 199, 206 Pac. 894, a wrongful death case. In that case a boy seventeen years old was driving pigs along a city street in the daytime. Defendant, driving a car and racing with another car in the street, negligently drove into the boy, killing him. A judgment for plaintiff was affirmed. Another case cited by plaintiff is *Stotts v. Taylor*, 130 Kan. 158, 285 Pac. 571. In that case two women were walking along the left-hand shoulder of a paved highway. Friends of one of them, in a car going in the same direction, stopped on the other side of the pavement and called to her that they would take her home. She

started to walk across the pavement. A truck was coming from her left. It was daytime, the driver of the truck saw her, and she could have seen the truck. There was conflicting evidence as to whether, while she was walking on the side of the pavement, she suddenly stepped in front of the moving truck, or whether the truck was driven against her when she was standing on the edge of the pavement and there was sufficient room on the highway for the truck to have passed her safely. The jury resolved that conflict in favor of plaintiff. The judgment was affirmed. The court held:

"The driving of a motor vehicle against a person standing upon the highway, where the pedestrian was seen by the driver, and there was ample time and opportunity to pass or to avoid striking the person, will ordinarily constitute negligence of the driver." (Syl. ¶ 3.)

The court also held:

"Pedestrians and drivers of motor vehicles have equal rights upon a highway, but each must use as reasonable care as the circumstances require and exercise his right with due regard to the rights of others using the highway." (Syl. ¶ 1.)

The case before us is readily distinguished from any of these cases cited and relied upon by the plaintiff. Here defendant did not see plaintiff, nor did she have any knowledge that he was walking along the shoulder of the paved portion of the highway; neither did she drive off the paved portion of the highway. His clothing was dark, and he was walking with his head down in the collar of his topcoat. He was on the shoulder near the right-hand side of the paved portion, going with the traffic on that side of the pavement, instead of being on the other side of the paved portion going against the traffic, where both he and the driver of the vehicle could see each other more plainly.

Defendant testified that about the time when her car must have come in contact with plaintiff she was meeting and passing a car from the opposite direction on the S curve, and that she was watching closely the black mark in the center of the pavement. She was asked how far she could see the mark with her lights. She disclaimed any judgment of distances, but being pressed answered affirmatively when she was asked if she could see it twenty feet ahead of her. She did not know whether she could see it a greater distance or not. Plaintiff argues from this that defendant's lights were not good enough to enable her to see objects ahead of her in the highway a sufficient distance to enable her to stop. We understand her

testimony to relate to the distance she could see the black mark in the center of the pavement ahead of her. We do not understand her testimony went to show how far she could see objects ahead of her on the highway. Her apparent lack of judgment of distances made the testimony of comparatively little value anyway. There is no testimony that there was anything wrong with the lights, and the jury found they were burning, although plaintiff had testified that the car had no lights. There is no evidence as to how close to the edge of the pavement defendant was driving, unless it can be assumed that she was nearer the outer edge of the pavement in order to pass with safety the car approaching her on the S curve, which would have been prudent, or unless it can be assumed from the very fact that the car came in contact with the plaintiff. That could have happened just as easily, however, by plaintiff turning with his face to the south when he heard the noise and stepping up on the edge of the pavement, as he testified was his custom. We find nothing in the evidence but speculation upon which to predicate liability of defendant. The simple fact that there was a collision and someone was injured is not of itself sufficient to predicate liability. (*Zinn v. Updegraff*, 113 Kan. 25, 35, 213 Pac. 816; 9 Blashfield Cyclopedia of Automobile Law, 399.) It is familiar law that negligence is never presumed; it must be established by proof. Like any other fact, it may be established by circumstantial evidence. (*Mayes v. Kansas City Power & Light Co.*, 121 Kan. 648, 249 Pac. 599.) But the circumstances "relied on must be of such a nature and so related one to the other that the only reasonable conclusion to be drawn therefrom is the theory sought to be established." (*Cornwell v. O'Connor*, 134 Kan. 269, 271, 5 P. 2d 861.) "A fact is not proven by circumstances which are merely consistent with its existence." (*Canestro v. Joplin-Pittsburg Rld. Co.*, 135 Kan. 337, 341, 10 P. 2d 902.)

In *Whiteker v. Wichita Rld. & Light Co.*, 125 Kan. 683, 265 Pac. 1103, it was held:

"A finding of negligence cannot rest on mere conjecture, but must be established by competent proof." (Syl. ¶ 1.)

See, also, *Beeler v. Railway Co.*, 107 Kan. 522, 192 Pac. 741; *Norman v. Railway Co.*, 101 Kan. 678, 168 Pac. 830, and *A. T. & S. F. Rly. Co. v. Toops*, 281 U. S. 351, reversing *Toops v. Atchison, T. & S. F. Rly. Co.*, 128 Kan. 189, 277 Pac. 57.

From a careful examination of the record in this case we are forced to the conclusion that the verdict in favor of plaintiff is predi-

cated upon mere conjecture as to how the casualty occurred and upon pure speculation as to negligence of defendant, and that the judgment based on the verdict cannot stand. It necessarily follows that the judgment of the trial court must be reversed with directions to render judgment for defendant.

It is so ordered.