No. 32,543

E. B. ALLISTON, *Appellee*, v. SHELL PETROLEUM CORPORATION, *Appellant.*

(55 P. 2d 396)

Opinion filed March 7, 1936.

*Albert Faulconer, Kirke W. Dale, C. L. Swarts,* all of Arkansas City, *Claude I. Depew, W. E. Stanley,* both of Wichita, *Joe T. Dickerson* and *George W. Cunningham,* both of Tulsa, Okla., for the appellant.

*R. Bowland Ritchie,* of Wichita, *Frank T. McCoy, John T. Craig* and *John R. Pearson,* all of Pawhuska, Okla., for the appellee.

The opinion of the court was delivered by

HARVEY, J.: Plaintiff brought this action for damages for the permanent injury to the fresh-water supply and water wells on land alleged to have been caused by salt water which defendants negligently and unlawfully permitted to escape from oil wells operated by them. Originally twenty-three persons, firms or corporations operating oil leases in the Greenwich field in Sedgwick county were named as defendants, but before the trial plaintiff dismissed his action against all defendants but four—the Shell Petroleum Corporation, the Gypsy Oil Company, E. Frank Jones, and the T. M. Deal Oil and Gas Company. At the close of plaintiff's evidence each of those defendants demurred thereto. The demurrer of the T. M. Deal Oil and Gas Company was sustained; the others were overruled. The jury answered special questions and returned a gen-

eral verdict for plaintiff of $11,000 against the Shell Petroleum Corporation. The answers to special questions and the general verdict relieved the Gypsy Oil Company and E. Frank Jones of liability. The Shell Petroleum Corporation has appealed and contends: (1) There is no substantial competent evidence to support the verdict, and that its demurrer to the evidence and subsequent motions for a directed verdict and for a judgment in its favor should have been sustained; and (2) that the court erred: (a) In overruling its motion to set aside answers to certain special questions and its motion to set aside the general verdict and to render judgment for defendant on the special findings as modified; (b) in refusing to give a requested instruction; and (c) in refusing to submit certain special questions to the jury.

Briefly stated, plaintiff alleged that he owned certain described land near Greenwich; that defendants conducted oil and gas mining leases in the Greenwich field; that they conducted their operations in violation of R. S. 55-118 and 55-121; that they caused and allowed salt water and other deleterious substances (hereinafter called salt water), produced from their operations, to escape from their leased premises and to enter the fresh-water strata on plaintiff's land, permanently polluting the same so as to make it unfit for use for domestic or livestock purposes; that the Shell Petroleum Corporation negligently and wrongfully collected the salt water from certain of the oil wells on its leases, and with a heavy pressure forced it into an abandoned well on its lease, and that it "broke through the casing, came up around the casing, and in other ways unknown to plaintiff" escaped into the fresh-water strata underlying plaintiff's land, polluting the same; that the Shell Petroleum Corporation collected salt water from some of its oil wells into a pond constructed over an unplugged water well, from which the salt water entered and polluted the fresh-water strata on plaintiff's land; that all the defendants turned salt water produced from a well back into the well between casings and turned salt water into ponds in such a way that it escaped and polluted the fresh-water strata on plaintiff's land, all to his damage in a sum named. The Shell Petroleum Corporation answered with a general denial and a plea of the two-year statute of limitations. Also it specifically denied that in its operations it violated any of the laws of the state, and alleged its operations had been in accord with the latest recognized and approved methods. After the trial was in progress it amended its

answer by further alleging that if the water on plaintiff's land had become polluted by salt water, "such . . . pollution was caused by . . . parties other than this defendant, to-wit:" naming seventeen persons, firms or corporations, fourteen of whom were originally named by plaintiff as defendants and the action later dismissed as to them, and three of whom had not been so named. It does not appear that any of these persons, firms or corporations was a party to the action at the time of the trial, or participated therein. The reply was a general denial. The jury answered special questions as follows:

"1. Do you find that salt water from the leases of any of the defendants polluted the seventy-two-foot water zone under the plaintiff's land? A. Yes.

"2. If you answer question number 1 in the affirmative, then state from what leases such polluting salt water came. A. Shell Petroleum Corp.

"3. If you answer question number 1 in the affirmative, then state how such salt water traveled from each of such leases of the defendants to the plaintiff's wells. A. Forced from the 2,000-foot zone from the Shell Petroleum Corporation disposal well.

"4. Under what portions of the plaintiff's land is the seventy-two-foot water zone polluted? A. Under the 440 acres.

"5. What was the fair and reasonable market value of the plaintiff's land immediately prior to the pollution of his water wells? A. Seventy-five dollars an acre.

"6. What was the fair and reasonable market value of the plaintiff's land immediately after the pollution of his water wells? A. Fifty dollars an acre.

"7. What elements have you considered in fixing the amount of damage? A. Pollution of the water under the 440 acres on the Alliston farm.

"8. Did the operators of any oil wells in the Greenwich field fail to properly case off and protect fresh-water sands? A. Unable to determine.

"9. If you answer question number 8 in the affirmative, then state which wells in the Greenwich field were not properly cased to shut off and protect fresh-water sands. A. Unable to determine.

"10. Is the Fischer water well in the southeast quarter of section 15 producing from the same water sand or formation as the Alliston seventy-two-foot windmill well? A. In our judgment it is.

"11. Is the Kraft windmill well in the northeast corner of the south half of section 13 suitable for watering stock? A. No.

"12. Is the seventy-two-foot water sand underlying plaintiff's land permanently polluted by salt water and oil refuse? A. Yes.

"13. Do you find that Gypsy Oil Company cemented its surface casing to prevent the commingling of water from the salt-water and fresh-water strata? A. Yes.

"14. Do you find that Gypsy Oil Company constructed salt-water ponds on its lease in which to impound its salt water? A. Yes.

"15. Do you find that any salt water escaped from the lease of Gypsy Oil

Company and went into plaintiff's well or wells or underground water-bearing strata? A. No.

.  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .

"17. Do you find that any salt water from the Jones 'Stockyards' oil well polluted the water well of plaintiff? A. No. . . ."

Appellant's principal contention here is that there is no substantial competent evidence to sustain the verdict. This requires an examination of the evidence. Before going into that, a few things may be noted concerning which there is no longer any controversy: (1) Appellant is correct in saying that in a tort action such as this a verdict for plaintiff which rests upon mere conjecture and speculation cannot be permitted to stand. (See *Hendren v. Snyder*, 143 Kan. 34, 41, 53 P. 2d 472, 476, and authorities there cited.) (2) It is conceded by appellant that plaintiff's "windmill" water well is polluted with salt water, and that the evidence is sufficient for the jury to find that the 72-foot water-bearing formation underlying plaintiff's land is so polluted. Hence, it will not be necessary to review the evidence on this point except as it is incidental to the principal point to be determined. (3) While appellant regards the amount of the verdict as large, the appeal is not from the excessiveness of the verdict. The contention is the evidence does not support any verdict against appellant. Hence, it is not necessary to review the evidence specifically relating to the amount of damages sustained by plaintiff. (4) Appellant in effect concedes its liability if there is substantial competent evidence to show that salt water from its wells polluted the fresh water in plaintiff's land, even though the evidence also shows that salt water produced by other operators contributed to such pollution.

With these things, which are no longer in controversy, in mind we will examine the evidence to see if there is substantial competent evidence to support the verdict against appellant. The accompanying plat may aid us. It has been prepared from plats furnished by the litigants, although not a reproduction of any of them; some details have been omitted, but so far as these are important they are supplied by description.

The figures 1, 2, 3, 4, 5, 6, 7 (in NE¼, sec. 23, NW¼, sec. 24, and SE¼, sec. 14) indicate locations of water wells on plaintiff's land. Other water wells noted are F-1, the Fischer well (on SE¼, sec. 15), G-1 on the Gypsy Oil Company lease (on NW¼, sec. 14), and K-1 and K-2, the Kraft wells in section 13, near the east side, all of

which were polluted. The figures 1, 2, 3, 4, on the Gypsy Oil Company's lease show location of its oil wells. The letters J show the location of operations of E. Frank Jones; the letters P of salt-water ponds discussed in the opinion; the letter X the Greenwich townsite, while A-1 (in NE¼, sec. 15) shows the location of appellant's discovery well, and B-4 (in SW¼, sec. 15) of its disposal well.

Plaintiff owns 440 acres (SE¼ 14, NE¼ 23, N½ of NW¼ and SW¼ of NW¼, 24, 26, 2 E) shown on the plat. The improvements are in section 23, near the east side. The principal well, No. 1,

spoken of as the windmill well, 72 feet deep (surface elevation 1,382 above sea level) furnished an apparently inexhaustible supply of water suitable for livestock and domestic use. The house well, No. 2, 30 feet deep, furnished good water, but the supply was small, scarcely enough for household use. Across the road east is a well, No. 3, 42 feet deep, which furnished a small supply of good water. In the hog lot north of the house is a well, No. 4, 42 feet deep, which furnished a small supply—only enough to water a few hogs— of good water. In the pasture on section 14 is a well, No. 7, 60 feet deep (el. 1,388), which furnished a fair supply—the windmill, if permitted to run, would pump it dry—of good stock water. In the fall of 1930 the water from the windmill well, No. 1, began to smell of sulphur, later to taste salty, and by March, 1931, became so salty that it was unfit for use. This action was brought in November, 1931. The 72-foot stratum from which the water in this well

comes is the formation extending under plaintiff's entire farm, now conceded to be polluted with salt water to the extent it is unfit for use. When this well became so polluted plaintiff deepened well No. 3 by having it drilled to a depth of 72 feet. At 60-odd feet a light vein of fresh water was struck; at 72 feet an abundance of water was found. It had a slight taste of salt, but could be used. It was used for stock from early in April, 1931, but it became more salty all the time until the next July, when it became so salty it could not be used. Plaintiff then drilled well No. 5 (el. 1,384), west of No. 1, to a depth of 74 feet, and found an abundance of water, but it was too salty for use. He then drilled well No. 6, a short distance north of No. 3, hoping to strike the light vein of fresh water at 60-odd feet and create a pocket there with a charge of dynamite sufficient to collect enough water for his needs from the fresh-water vein, but when this was done the water in that well was too salty for use.

In 1928 drilling for oil began in the Greenwich field. The Shell Petroleum Corporation completed its first well June 30, 1929. It is situated in the southeastern part of NE¼, sec. 15, marked A-1 on the plat, and is spoken of in the record as the discovery well. By March, 1931, appellant had 15 producing oil wells which it was operating on leases owned or controlled by it, covering all of section 15, except the townsite of Greenwich situated on a part of the S½, SW¼, sec. 15, and covering also part of sections 14 and 22, as shown on the plat. We have not attempted on our plat to show the location of all wells operated by appellant. Also, by March, 1931, 21 oil wells had been drilled within the townsite of Greenwich—four by appellant, five by T. M. Deal Oil and Gas Co., one by E. Frank Jones, near the east side of the townsite, north of the railroad, marked "J" on the plat, and spoken of in the record as the "stockyards well," and the others by various persons, firms, or corporations. Also one or two oil wells had been drilled on the N½ NW¼, sec. 22, and perhaps a few in sections 10 and 11, north of 15 and 14. These operators, or most of them, were originally named as defendants in this action, but it was dismissed as to them before the trial. E. Frank Jones had also operated to some extent on the E½ of SE¼ of NE¼, sec. 22, also marked "J" on plat. The lease of the Gypsy Oil Company covered the NW¼ and the NW¼ of the SW¼, sec. 14, and on this four oil wells had been drilled, as shown on the plat. These wells were completed in May, June and December, 1929. In drilling them no gas was discovered and no salt water was

found except that contained in the oil. There is no showing in the record that any gas or salt water was encountered in drilling any of the oil wells in the Greenwich field, except that contained in the oil. Each well that produced oil produced salt water with the oil. The operators separated the oil from the salt water by settling tanks at the wells, or by some other process.

The Gypsy Oil Company disposed of the salt water from its four oil wells by piping it into salt-water ponds. These were constructed by taking the dirt to a depth of about four feet from an area the size of the pond desired and piling it around the edges. It first constructed such a pond on the NW¼, sec. 14, near the west line, large enough to hold 20,000 barrels of salt water. This proved insufficient, and another similar one, with a capacity of 25,000 barrels, was constructed adjoining the first. Into these two ponds, by March, 1931, the Gypsy Oil Company had turned 175,000 barrels of salt water. What the ponds would not hold had percolated into the subsurface strata—perhaps some of it had evaporated.

The evidence discloses that for some months early in 1930 E. Frank Jones, in the operation of his "Stockyards well," had turned the salt water back into the well between two strings of casing therein. There is evidence that a few other operators in the Greenwich field, and some in the Benton field—six miles east of Greenwich—disposed of their salt water by piping it into salt-water ponds, similar to the method used by the Gypsy Oil Company, or turned it back into the oil well, between casings, similar to the method used by E. Frank Jones.

The oil-producing area of the Greenwich field appears to have been from a short distance southwest of the Greenwich townsite north and east through to sections 15, 14 and 11. East and south of this area dry oil-well holes had been drilled—one on plaintiff's land in section 24, near the northeast corner, two on the S½ of NE¼, sec. 22, and on appellant's lease was one on the NE¼, SW¼, sec. 14. North and west of the producing area on appellant's lease there was a dry hole, a location northeast of the center of section 15, and another, marked B-4 on the plat, and known in the record as the disposal well, a short distance north of the northwest corner of the Greenwich townsite. Also, by March, 1931, some of the oil wells operated for a time had been plugged. This appears to have included most of the wells in the Greenwich townsite, two on appellant's lease just north of the townsite, and one in section 14, near the

west line, and also one on the Graham Bros. lease on the NW¼ of NW¼, sec. 22.

Appellant began disposing of its salt water in ponds. The map shows three of these, but only one was described in the testimony. This was located north of the Greenwich townsite, about the center of the N½, SW¼, sec. 15 (el. 1,387), and over an unplugged water well about 60 feet deep. These ponds being insufficient to care for the salt water produced by appellant's operation, it began, on November 3, 1929, to turn the salt water into the disposal well, B-4, and by the middle of March, 1931, a total of 2,780,325 barrels of salt water had been produced from its oil wells and injected into B-4, beginning with atmospheric pressure and increasing gradually to a pressure of 750 pounds per square inch by October, 1931, and to 950 pounds by December 2, 1931, at which time it discontinued the well as a disposal well, having acquired a pipe line to the Arkansas river for disposing of its salt water. The jury found the salt water forced into this well B-4 by appellant polluted the plaintiff's 72-foot fresh-water stratum, and appellant contends that finding is not sustained by the evidence.

Perhaps here we should set forth the logs and casing record of the discovery well, A-1, and the disposal well, B-4. The discovery well, A-1 (el. 1,388), was drilled with cable tools to a depth of 3,174 feet, where oil mingled with salt water was discovered. The first water shown by the log was in a gray shale, 1,900 to 1,920 feet, which produced 2½ bales of water; the next was in fine sand, some gray shale, from 1,930 to 2,942 feet, which produced 3 bales of water at 1,999 feet. The casing record shows: 20-inch casing set at 78 feet; 15½-inch set at 788 feet; 12½-inch set at 1,333 feet; 10-inch set at 1,766 feet; 8¼-inch set at 2,770 feet; 6⅝-inch set at 3,053 feet, and 5-inch set at 3,160 feet. The testimony was that the various-sized casings were set in an oil well when it was being drilled to shut off water encountered in the drilling. If that was the reason for setting the various sizes of casing in this well the log does not show all the water strata encountered in the drilling. There is at least an intimation in the evidence that logs of wells are not always accurately kept. The disposal well, B-4 (el. 1,388), was drilled with rotary tools to a depth of 2,963 feet. The log of this well does not show that any water-bearing formation was encountered in the drilling. There is evidence to the effect that it is not so easy to keep

an accurate log of a well drilled with rotary tools as it is of one drilled with cable tools. The log shows a 120-foot stratum of "broken lime" from 1,832 to 1,952 feet, and 105 feet of "shale-shells" from 1,952 to 2,057 feet. No oil was discovered in this well. It was plugged at 2,887 feet with a wooden plug, and appellant concluded to use 124 feet of it at a depth of 1,896 to 2,020 feet as a salt-water disposal well, not because a water-bearing formation had been found in this well at that depth, but because two water-bearing strata had been found in the discovery well, A-1, at about that depth. The casing and plugging records of this well, B-4, show that a 15½-inch casing was put into the well 87 feet and left there, and that an 8⅝-inch casing was put into the well 2,561 feet. The 8⅝-inch casing was "knocked off" (perhaps with a shot of some kind) at 2,020 feet, and the part of the casing below that point was left in the hole and plugged at that point with a cement plug. The 8⅝-inch casing was then pulled up 124 feet, so that the upper string of it was suspended in the well, with the lower end at a depth of 1,896 feet. The plugging record shows "bridged hole and recemented 8⅝-inch casing at 1,896 feet with 50 sacks cement and 25 lbs. calcium chloride."

This was on October 25, 1929. On February 11, 1930, the plugging record shows "recemented between the 15½-inch and 8⅝-inch casing to the top of the hole with 430 sacks . . . and then cemented the cellar with 50 sacks." What is spoken of as the cellar is an excavation at the top of the well 8 by 8 and 8 feet deep. The bottom of this was cemented; the sides were not. The 15½-inch casing came to the top of the cement in the bottom of the cellar.

In the latter part of January, 1930, salt water came up in the cellar of Gypsy well No. 4 (el. 1,372) between the 12½- and 8¼-inch casing and filled the cellar (8 x 8 x 8), and overflowed. That continued for several months and amounted to about 250 barrels per day in May, 1930. It became necessary to cement the well between the two strings of casing to shut this water off. It took about 240 pounds pressure to put the cement in against the pressure of the salt water coming up. Salt water also came up between the casing at Gypsy well No. 1 (el. 1,380), but did not overflow the cellar.

A chemist, called as a witness by plaintiff, testified that he had examined and made an analysis of water taken from appellant's disposal well September 29, 1934 (our mark "A"), and also water taken from plaintiff's windmill water well of the same date (our

mark "B"), and of water taken from plaintiff's windmill water well in March, 1935 (our mark "C"). These analyses showed parts per million of the solid contents to be as follows:

|  | A | B | C |
|---|---|---|---|
| Calcium | 4747.1 | 1830.7 | 2059 |
| Magnesium | 1747.6 | 349.9 | 381 |
| Alkalies | 36537.8 | 3672.2 | 4188 |
| Chlorides | 68759.0 | 8795.7 | 9827 |
| Sulphate | 53.5 | 1381.8 | 1892 |
| Bicarbonate | 67.1 | 183.0 | 232 |

He testified that in his opinion 1.65 parts of water A mixed with water B would produce substantially water C. He was interrogated about the greater quantity of sulphate and bicarbonate shown in waters B and C compared with A. He testified the variation of those elements, as shown in analysis B and C, might indicate a normal variation in the water, but those compared with analysis of water A indicated either a greater quantity of sulphates and bicarbonates in the Alliston water before water B mingled with water A, or that water A, at some place between the disposal well and the Alliston well, had passed through or come in contact with formations which increased its sulphate and bicarbonate contents. Furthermore, these elements were not what made the Alliston water unfit for use.

V. L. Martin was called by plaintiff as an expert witness on disposal of salt water and other oil-field waste and the pollution of fresh water therefrom. He was a graduate of the university engineering course, employed for a time as an engineer by the federal government, and from 1916 to 1932 was the chief engineer of a large oil-producing company, having general charge of all its engineering activities, including all engineering work necessary for the production and marketing of crude oil, the disposal of waste and salt water in producing fields, and pollution problems. Since 1932 he has maintained his own office as consulting engineer on such questions. For three years he was chairman of the American Petroleum Institute's committee on disposal of production waste. He had been employed frequently on such problems, not only by various oil companies, but by cities, counties, states, and the federal government. He did not qualify as an expert chemist or geologist, although in his work he had much to do with both of those subjects. His qualifications are not questioned on the matters concerning which he testified. He had been familiar with the Greenwich oil field since oil operations began there, and he had personally gone over the field on more than one

occasion, examined the logs of many of the oil wells, obtained information respecting the water wells, and observed and studied the method of oil-production operations therein, and the method used by the operators in disposing of the salt water. He gave it as his opinion that the 72-foot formation from which plaintiff's principal water supply came extended throughout the entire field, with occasional hard spots therein where dry water wells had been drilled; that the disposal of salt water by turning it back into oil wells between the casings was a dangerous practice unless it was permitted to go in with gravity or very low pressure; even then it might permit the salt water put back into the well to escape into fresh-water strata; that salt water put into ponds would percolate into subsurface strata down and out from the bottom of the pond and would pollute any fresh-water strata with which it came in contact. He examined the log and the casing and plugging record of appellant's disposal well B-4 and gave it as his opinion that the formation into which the salt water was injected in that well was not sufficiently porous to absorb it; that it would naturally seek to escape from the point of injection in the direction of the least resistance; that with the force applied to it, and the quantity of water put into the well, there was no possibility that it could be retained in the formation in which it was placed, but that it would go into any formation, below or above that, which it could get into, following the line of least resistance; that the plugging of that well, as shown by records, was not such as to prevent the salt water forced into it from coming up in the annular space inside of the well outside of the 8⅝-inch casing and getting into and polluting the fresh-water formation from which plaintiff's supply of fresh water was obtained. He further testified that following the way of least resistance the water injected into the well might follow out through the formation into which it was injected until it reached another oil well which had been drilled into that formation and come up around the casing of such well to the fresh-water strata, and that it might come up through cracks in the underground formation. He gave it as his opinion that the water which came up into the cellar of the Gypsy Oil Company's well No. 1, and the water which came up into and overflowed the cellar of the Gypsy Oil Company's well No. 4, was water that had been forced into the injection well B-4 by appellant, and that the salt water injected by appellant into its disposal well B-4 is the salt water which had polluted the 72-foot water-bearing formation under plaintiff's

land, and that in reaching that conclusion he had attempted to eliminate other sources of possible pollution. He further testified that the salt water which polluted the fresh-water stratum under plaintiff's land came from the west, and that in his opinion the pollution was permanent.

All logs of wells and core drillings used in the evidence showed one or more anhydrite beds between the elevation of 72-foot water-bearing formation under plaintiff's land and that of the bottom of the disposal well. Hence, if the water from the disposal well polluted the water under plaintiff's land it had to pass through or by these anhydrite beds. Anhydrite is a dry soluble calcium sulphate. This would account for the fact that the chemical analysis of waters from plaintiff's 72-foot well showed it contained more parts per million of sulphate than the water from appellant's disposal well.

There was evidence that near Benton, six miles east of Greenwich, there were oil-well operations, and that the operators disposed of the salt water in ponds or by turning it into the well between casings. There was also evidence to the effect the 72-foot water-bearing formation under plaintiff's land dipped from the east to the west at the rate of about 18 feet per mile, and that it outcropped at the surface near Benton. While there appears to be some conflict in the evidence as to this dip and outcrop, we shall not bother with that. Appellant contends the pollution of which plaintiff complains could have been caused by the salt water permitted to escape by the operators in the Benton field, and that this source of pollution has not been eliminated. The point is not well taken. The evidence makes it clear that the salt water which caused the pollution of which plaintiff complains came from the west. Not only is that the testimony of Martin, but the evidence shows that plaintiff's windmill well, No. 1, became so polluted in March, 1931, as to be unfit for use, while east of it the deepened well, No. 3, did not become so polluted until in July of that year. The evidence also shows that the Fisher well, F-1, west of plaintiff in the SE¼, sec. 15, was found to be polluted in March, 1931, and the water well on the Gypsy lease G-1, west of plaintiff in the NW¼, sec. 14, was found to be polluted in January, 1932. Just how long either of those wells had been polluted when the pollution was found is not shown by the evidence. The Kraft well, K-1, in the northeast corner of the S½, sec. 13, was polluted by the early part of 1933, and another well drilled on the Kraft land, K-2, was a little salty in July, 1933, but got worse as it was pumped, until the fall of that year it was so polluted it could

not be used. Hence, there is eliminated any possible pollution from operators in or near Benton, irrespective of the dip or out-crop of the 72-foot water-bearing formation on plaintiff's land.

Appellant argues pollution by the salt water of other operators is not eliminated by the evidence, and specifically refers to the fact that the Gypsy Oil Company turned 175,000 barrels of salt water into ponds having a capacity of only 45,000 barrels, and argues that approximately 130,000 barrels of this must have percolated into subsurface strata, and that this could have been the source of the pollution of which plaintiff complains. This point is not well taken. The evidence is clear and not controverted that salt water percolating into subsurface strata from salt-water ponds pollutes the first fresh-water stratum with which it comes in contact, that is, the one nearest the surface of the ground. The evidence also shows the fresh-water strata on plaintiff's land nearer the surface than the 72-foot stratum were not polluted. This eliminates the possibility that the pollution of which plaintiff complains was caused by water which percolated from salt-water ponds of the Gypsy Oil Company, or of appellant, or of any other operator in the Greenwich field. There is other evidence which tended to justify the jury in relieving the Gypsy Oil Company of liability in this case, but we do not deem it necessary to set it out, since the question of the Gypsy Oil Company's liability is not before us. ·

Appellant argues that the pollution of which plaintiff complains, by salt water put back into the oil wells between casings, has not been eliminated by the evidence. As before stated, there is evidence that for several months in the early part of 1930, Jones put the salt water from his stockyards well back into the well between the casings. There is evidence that salt water was disposed of in the same way by other operators in the Greenwich field—including the appellant, particularly in its discovery well A-1, although most of that was after March, 1931. None of this water was forced into the well, but flowed in by gravity. It is in evidence that the state corporation commission recommends this method of disposing of salt water. There is no intimation in the evidence that in disposing of their salt water as they did either Jones, or any other operators using this method, violated the regulations of the corporation commission pertaining thereto. Plaintiff's witness, Martin, did say there were circumstances in which salt water put into an oil well between casings would get into fresh-water strata. He was not asked to describe

such circumstances. Whether it would do so or not perhaps would depend on the location of the fresh-water strata, the depth of the casings between which the salt water was run, the formation in which the outside casing was set, and how it was set. No showing was made either by plaintiff or by appellant on those matters. They seem to have left the matter with the showing that some operators put salt water back into wells in substantial conformity at least with the rulings of the state corporation commission, with the bare possibility, from Martin's testimony, that such water, under some circumstances, might pollute fresh-water strata. Perhaps that is the reason the jury relieved Jones of liability to plaintiff in this case, although the question of Jones' liability is not before us. We regard the possibility that the pollution of which plaintiff complains came from this source as having been fairly well eliminated by the evidence; certainly it was not established.

This leaves the only reasonably possible source of the pollution of which plaintiff complains to be the salt water which appellant injected into its disposal well B-4 by heavy pressure. That is what the jury found, and the finding was approved by the trial court. The evidence supporting it may be summarized as follows: Disposing of salt water by forcing it with heavy pressure into an oil well is not recommended by the state corporation commission, and Martin, with his years of experience in the disposal of salt water from oil-well operations, said it is a dangerous practice. The formation into which appellant injected the salt water in this well would not absorb it readily; that is shown by the fact that heavy pressure had to be used to get the water into the well. When the salt water was put into this well by force, and into a formation which would not absorb it without such force, it would escape in the way or direction where it met the least resistance, which might be out in any direction, or down or up into some other formation. That was Martin's testimony; but more than that, it is a matter of common knowledge. If the least resistance to the escape of such water was up the well on the outside of the pipe, that is the way it would go until it found some formation which would permit it to spread out. If that was the 72-foot fresh-water-bearing formation under plaintiff's land it would pollute the water in that formation. That is the substance of Martin's testimony on that point, and we see nothing unreasonable about it. Now, there is evidence that early in 1930 salt water from some source came up between the casings at two of the Gypsy Oil

Company wells, and at one of them filled and overflowed the cellar· for several months, until it was necessary to fill the space between the casings with cement in order to stop the flow of the salt water, and that it required a pressure of about 240 pounds to the square inch to force the cement into the casings. This salt water had to come from an oil well, for no salt water was discovered in the field other than that found with the oil, or separated from the oil and put back into some well. Apparently it had been so separated from the oil and put back into some well, for it was not mixed with oil. It came with force. The only operator using force to put salt water into a well was appellant—in its well B-4. There was no gas discovered in the field, nor anything else suggested by the evidence which could have forced salt water up the casings of the Gypsy Oil Company's well except the force applied by appellant in putting salt water in its disposal well, B-4. Another thing: The 72-foot formation from which plaintiff got his water supply dips to the west. Witnesses for plaintiff and appellant agree on that; the apparent conflict in the evidence about it pertained to the extent of the dip, · whether the dip is uniform, and the place of the outcrop of the formation. Naturally, the lower elevation of that formation was filled with water. The salt water which polluted it came from the west. Salt water is heavier than fresh water. The formation was polluted over a wide area. Naturally it would take force to cause salt water to come into that formation already filled with water and pollute it so thoroughly over such a large area. The only place where salt water was being put into the ground with force in such a way that it could pollute this formation was at appellant's disposal well B-4. The evidence discloses that when appellant quit forcing water into the disposal well in December, 1931—the pressure last used was 950 pounds to the square inch—and took the force pump off it, salt water came up out of the well with a pressure of 135 pounds. This water was piped to the salt-water pond, and the well continued to flow salt water into the pond up until the trial of this case in March, 1935. This indicates plenty of force on the water in the well. Perhaps other items of evidence should be taken into account, but we deem these sufficient to show that there was abundance of substantial competent evidence to sustain the verdict; indeed, it is difficult to see how any other verdict could have been returned under the evidence.

Appellant points out what it regards as conflicts or discrepancies

in the testimony, especially of plaintiff's expert witness, Martin, brought out on cross-examination. A detailed analysis of these is not deemed necessary. The weight to be given to his testimony was for the jury and the trial court.

From what has been said it was not error for the trial court to deny appellant's motion to set aside answers to special questions Nos. 1, 2 and 3. Appellant makes much out of the answer returned by the jury to special question No. 8, and says it is equivalent to "no." Plaintiff argues the answer is equivalent to "yes," since appellant in its second amended answer specifically alleged the pollution of plaintiff's water was caused by other operators, naming them. Our view is, this question and No. 9 should not have been submitted, for neither party had offered evidence from which it was possible for the jury to answer any other way than it did. Special questions, the answers to which cannot be found in the evidence, should not be submitted to the jury. In fairness to the trial court we should say counsel advise us these questions were in a list handed to the court for submission, and the court, having examined them, marked them not to be submitted, but through an error in copying the list they were included in questions submitted. We do not regard either the questions or the answers as having any bearing on the merits of this appeal.

Appellant complains of the refusal of the court to give an instruction to the effect that before plaintiff could recover from appellant he must prove that it "was responsible for or contributed to a permanent pollution of his fresh water." This requirement was embodied in the instructions given; in fact, the trial court, in several of its instructions, from different viewpoints, treated the matter of the permanency of the pollution and the necessity of plaintiff's proving it. Appellant argues that if the pollution came from salt water it injected into the disposal well, and if, as was shown by the evidence, it had discontinued injecting salt water into the disposal well, eventually, at some time in the future, the salt water in the 72-foot formation on plaintiff's land would be pumped out or find some other outlet, and that the water would clear up. Plaintiff's expert witness, Martin, testified that was possible, although he further testified that in his opinion the 72-foot formation was permanently polluted. The evidence discloses that plaintiff's windmill well was thoroughly polluted in March, 1931. The trial of this case was had about four years later, in March, 1935. The chemist's

analysis of the water taken from plaintiff's well a few days before the trial showed a greater chloride content than an earlier analysis of the water from the well, indicating that the pollution had increased rather than diminished up to the time of the trial. The evidence further showed that up to March, 1931, appellant had injected into its disposal well approximately 2¾ million barrels of salt water, and had continued the injection under increased pressure until December, 1931; that some of this water had escaped by coming up between the casings of the Gypsy Oil Company's well No. 4 and running over the cellar—about 250 barrels a day for a time; also, that since appellant had ceased injecting salt water into its disposal well in December, 1931, the salt water had been running out of the top of that well, but the quantity was not estimated. It further disclosed that the 72-foot water-bearing formation under plaintiff's land was polluted over a wide area. The length of time it would take plaintiff's windmill well to clear up from this pollution by the pumping of water from that and other wells to the same formation would be so long that the jury, under the evidence, was justified in finding it permanently polluted.

Appellant further complains of the refusal of the court to submit certain additional special questions relating to the possibility of pollution of plaintiff's well water from the operation of certain other operators. In view of the evidence with reference to the possibility of pollution from the operations of such parties previously discussed herein, and in view of the fact that the court did submit more special questions than it was required under the statute (R. S. 60-2918) to submit, there was no error in this ruling.

The judgment of the trial court is affirmed.