No. 38,918

STELLA BRIGGS, *Appellant,* v. CLYDE BURK and THE HARTFORD ACCIDENT AND INDEMNITY COMPANY, a Corporation, *Appellees.*

(257 P. 2d 164)

Opinion filed May 11, 1953.

*Ward D. Martin* and *Arthur L. Claussen,* both of Topeka, argued the cause, and *A. Harry Crane,* of Topeka, and *Leonard W. McAnarney,* of Lyndon, were with them on the briefs for the appellant.

*David H. Fisher,* of Topeka, argued the cause, and *Irwin Snattinger,* of Topeka, was with him on the briefs for the appellees.

The opinion of the court was delivered by

PARKER, J.: This was an action to recover damages for wrongful death. The plaintiff appeals from the trial court's action in sustaining a demurrer to her evidence, in rendering judgment against her for costs, and overruling her motion for a new trial.

No important issue is raised respecting the pleadings. Therefore all that need be said respecting them for the moment is that the second amended petition, hereinafter referred to as the petition, charges the proximate cause of the accident and the death of plain-

tiff's husband, Joseph Edward Briggs, were due to divers acts of negligence on the part of defendant, Clyde Burk, while driving his Ford truck, insured by the defendant The Hartford Accident and Indemnity Company as a private motor carrier of property under a permit issued by the state corporation commission, on the public highways; that the defendants' separate answers deny generally all acts of negligence charged against Burk and assert the accident and death of Briggs resulted from various acts of negligence on the part of one Burns, with whom such Briggs was riding in the other vehicle involved in the accident under conditions and circumstances making him liable for the acts of negligence of the operator of such vehicle; and that plaintiff's separate replies to the answers deny generally and specially all acts of negligence relied on as a defense to the petition, including the facts therein stated which, if established, would have made the said Briggs responsible for any acts of negligence charged against the driver of the automobile in which he was a passenger at the time of his death.

Upon issues joined, as above related, the cause came on for trial by a jury. Plaintiff adduced her evidence and rested. Defendants then demurred to the evidence on the ground it failed to prove a cause of action. Thereupon, after consideration of arguments on the issue thus raised, the trial court sustained the demurrer, discharged the jury, and rendered judgment in favor of defendants and against the plaintiff for costs. Thereafter, and following the overruling of her motion for new trial, plaintiff perfected the appeal to which we have heretofore referred.

Before giving consideration to the cause on its merits one question raised by appellees requires attention. They point out some of appellant's brief is taken up in describing Exhibits 1 to 10, incl., pictures taken at the scene of the accident on the day following its occurrence, and Exhibit 15, a large diagram of the scene of the accident; that these Exhibits were not included in the abstract furnished by the appellant; and that prior to filing their brief they filed a motion to have them stricken from consideration on appeal, which motion was overruled with leave to renew at the hearing on the merits. Appellees have renewed their motion and insist that it be sustained. In addition they argue such Exhibits are entitled to no consideration in disposing of the cause. It should be stated failure to include these Exhibits, and reference thereto in appellant's brief without their inclusion, in the abstract has made the work of this court difficult and burdensome. However, the fact remains

that all such Exhibits, which we pause to note are of such size that to include them in the abstract would have made that document bulky and unwieldy, were introduced in the court below and it must be conceded they were available to the parties in the office of the clerk of the district court of Shawnee county, the very county in which the case was tried, and heard on appellate review. It should also be added that appellees were able to file a brief answering the contentions advanced by appellant with respect to such Exhibits and that on the day prior to the hearing of the cause in this court appellant procured and filed them with the clerk of this court for our consideration. Under the foregoing circumstances, although it should be said the practice followed by appellant is not to be encouraged or unreservedly approved, we fail to see where appellees have sustained any prejudice to their substantial rights as a result thereof. Therefore the motion and appellees' contentions with respect thereto are overruled. It should perhaps be added the two decisions on which they rely are clearly distinguishable and hence do not sustain their position on this point. In *Phillippi v. Speer*, 152 Kan. 325, 103 P. 2d 777, there was no abstract of the evidence, and neither the abstract nor the brief of appellant contained any assignment of error. In *State v. Graham*, 172 Kan. 627, 242 P. 2d 1067, the record failed to set forth the motion for a new trial or the grounds on which it was based and in no way disclosed what alleged trial errors were brought to the attention of the trial court when it was heard. We held that in that situation rulings of the trial court on the motion for new trial were not subject to appellate review.

The first and most important of the questions raised by appellant in somewhat numerous specifications of error is that the trial court erred in sustaining the appellees' demurrer to her evidence. It goes without saying, this claim requires a detailed review of the evidence. We therefore turn to the record which, it should be kept in mind, must be analyzed in the light of the well established rule (See *Blankenship v. Fraker*, 173 Kan. 438, 249 P. 2d 683, recently followed in *Messinger v. Fulton*, 173 Kan. 851, 252 P. 2d 904; *Cain v. Steely*, 173 Kan. 866, 252 P. 2d 909, and *Tuggle v. Cathers*, 174 Kan. 122, 127, 254 P. 2d 807, citing numerous decisions and referring to sections of a well-known Kansas Digest where other cases of like import may be found) that in ruling on a demurrer to evidence courts do not weigh nor compare contradictory testimony but must accept all evidence as true, give it the benefit of all inferences that

may be drawn therefrom, and consider only such portions thereof as are favorable to the party adducing it.

Applying the rule and without reference to evidence touching questions of negligence or conditions existing at the moment of the collision of the vehicles in question we shall first give our attention to the facts of record essential to a proper understanding of the over-all factual picture.

On the morning of February 9, 1950, Clyde Burk, who was engaged in the nursery business at that point, left Dodge City driving a 1949 Ford half ton pickup truck, bound for Topeka, heavily loaded with 2,500 to 3,000 elm seedlings. Late in the afternoon of that day he had reached a point several miles south of Carbondale and was traveling north toward Topeka on U. S. Highway 75. On the afternoon of the same day four men, Robert Burns, Max Wade, Lewis Perry, and Joe Briggs, who had been riding to and from work in a 1940 Buick Sedan, owned and driven by Burns, left Topeka in that vehicle, traveling south on the same highway in the direction of Carbondale. Burns lived two miles north of Lyndon, Wade lived south of Lyndon, Perry lived in Carbondale, and Briggs lived about one and three-fourths miles south of Carbondale. Burns, who was a careful and prudent driver, was driving and the automobile was in good mechanical condition. No stops were made along the road until they reached Carbondale where Perry got out and started to walk home. Perry, who was the last eye witness to see the Buick before the accident, stated that when he got out the car started off slowly; that at that time Wade was riding in the front seat beside Burns and Briggs in the back seat; and that after he had walked about two hundred and seventy feet toward his home he heard a crash which subsequent investigation disclosed was due to the accident in question.

After leaving Carbondale the Buick proceeded south on U. S. 75 approximately a quarter of a mile to a point on such highway where there was a collision between it and the Ford truck, coming from the opposite direction, which resulted in the death of all three occupants of the Buick and serious injuries to appellee Burk, who was driving the truck. There were no eye witnesses to the collision but it is clear from the testimony of the witnesses who heard the crash that it occurred at 5:45 p. m., in broad daylight, at a time when the road was dry and there was nothing, so far as weather conditions were concerned, to impair the visibility of the drivers of either vehicle.

Further examination of the record reveals, as appellant frankly concedes, that if her evidence is sufficient as against the demurrer it must be on the basis of facts existing prior to the collision and the physical facts and circumstances observed by witnesses after the crash occurred. For that reason, without comment on the weight of the force and effect to be given it, we shall now proceed to summarize and at times quote from the evidence of record relating to prior facts on which appellant relies to sustain her position.

The first person to observe the truck involved in the accident on the date in question was witness Dawson who was returning to his home in Carbondale. He saw a gray Ford pickup truck, loaded with nursery stock, ahead of him, traveling north on U. S. 75 twenty-seven or twenty-eight miles south of where the collision occurred. He testified that every time he attempted to pass the truck it would veer across the center line of the highway over to the west side of the lane of travel for south bound traffic; that he followed it for some eight or ten miles, seeking an opportunity to pass, but that it continued to waver down the highway, crossing the center line thereof into the west side at least five times to the mile; that during all that time the truck was traveling between fifty to sixty miles per hour; that he finally succeeded in passing it about four miles south of Lyndon; and that he heard of the accident south of Carbondale about twenty to thirty minutes after he reached his home. In response to a question as to what prevented him from passing the truck this witness answered "Occasionally it was oncoming traffic, most of the time it was because the driver of the truck kept veering across the road to the left and then he'd veer back and then veer back across the road again."

Witness Jolley, a highway maintenance man, stated that he saw a gray pickup truck loaded with nursery stock and noticed the word "Nursery" painted on the side five and one-half miles south of Lyndon; that he followed it for about one-half mile before it passed from sight; that during that period of time it passed the center of the highway two or three times; and that on such occasions the left wheels would go over and one side of the truck would cross.

Three other witnesses, members of a highway maintenance crew, testified they observed a gray Ford pickup truck, with a "Burk Nursery" sign on the side, parked about one and one-half miles south of Lyndon.

The next witness to see the truck was Clyde Flory. He was riding in an automobile, going south on U. S. 75 at a time, fixed by him

between 5:30 and 5:45 p. m. when he saw a Ford pickup truck approaching on the highway from the south, immediately north of the intersection of U. S. 50N and U. S. 75. This according to other evidence would have been less than two miles from the scene of the accident. He watched the truck for about a quarter of a mile as it approached and passed. His attention was drawn to it because it was weaving across the highway. In describing the way the truck proceeded along the highway from the time he first observed it until it approached the car in which he was riding, he said:

"Well, when he came through the bridge he pulled over probably more than half of the truck across the center line and then after he came through the bridge he pulled back on his side of the road and at least five or six times between that time and the time he approached us he crossed over until his wheels crossed over the center line over onto the west side of the highway."

Other questions asked this witness and his answers thereto, relating to what he saw at that time and what happened immediately thereafter, read:

"Q. Now what happened as the Ford pickup truck approached close to Mr. Fisher's car? A. Well, as we got right up close, probably within 25 or 30 yards, he pulled over the furtherest he had been until more than half of his truck was across the line and then he swerved back just before we got to him.

"Q. Now, when you say more than half of his truck was across the line, on which side of the highway? A. On the west side.

"Q. And the west side of the highway was the side you were using to proceed south, is that correct? A. Yes, sir.

"Q. Did you observe anything else about that Ford pickup truck, can you describe it as it went by you? A. No, sir, except that it was just a grey Ford truck."

This witness also stated that he had had occasion to observe the Burk truck after the accident and identified it as the same truck that he had passed on the highway. When interrogated on cross examination he fixed the location of the truck as probably 300 yards north of the junction of U. S. 75 and U. S. 50N and the point of passing that vehicle at about a mile and a quarter from where the accident happened.

The last witnesses to observe the truck before the accident were Mr. and Mrs. Roush who live in Topeka and were traveling north on U. S. 75, returning to their home. They both testified in substance that they first saw the gray Ford pickup truck with the words "Burk's Nursery" on the side parked off the highway near Lyndon; that they next saw it at a point when they were about a mile or so south of Carbondale when it overtook and passed them on the

highway; and that they next saw it at the scene of the wreck. With respect to what happened at the time the truck passed him and what happened thereafter until it passed from his view, Mr. Roush was asked questions to which he made answers as follows:

"Q. Where was that with reference to Carbondale, Kansas, that you observed that truck again? A. Well, I would say probably a mile or something like that.

"Q. In which direction from Carbondale? A. South.

"Q. What happened then when you observed that car in your rear vision mirror? A. Well, it was traveling at a high rate of speed, I was doing 50 miles an hour myself when the pickup went by, and traveling at a high rate of speed, and also before he passed out of sight he was on the wrong side of the highway twice.

"Q. Can you describe the way he was travelling north on Highway 75 after he passed you? A. Well, as I said, in a waving line, you see, on the wrong side of the highway before it passed from view.

"Q. And where did it pass from your view? A. Right there south of Carbondale at that hill."

Regarding the same subject the record discloses Mrs. Roush was asked questions to which she made answers as follows:

*Direct examination*

"Q. Did you see that Ford pickup truck again later while you were still proceeding to Topeka? A. Yes, sir.

"Q. Where did you see it the next time? A. Oh, it was on down the road but I just don't know how far, but I know at the time I said there is that pickup again.

"Q. What was it doing the next time you saw it? A. Well, we noticed he was all over the road.

"Q. Was the Ford pickup truck proceeding in the same direction you were? A. Yes, sir.

"Q. Did it pass your car? A. Yes, sir.

"Q. Do you know how fast you were going at the time this pickup truck passed you? A. Right around 50 miles an hour.

"Q. Can you describe the way in which the Ford pickup truck passed the car you were riding in? A. Well, just real fast, he was just really going, he just went around us real fast, just a streak.

"Q. How did the car, the Ford pickup truck proceed down the highway after it passed your car? A. Well it was on the wrong side of the road, I know, at least a couple of times.

"Q. Where did you last lose sight of it while it was proceeding along the highway? A. You say where?

"Q. Yes. A. I don't remember.

"Q. When did you next see that Ford pickup truck? A. Well just as we, well first we saw a wheel go up in the air and we were right there and saw it then, just after the wreck, just as the wreck was—just as we slowed down there.

"Q. Where were you when you saw a wheel go up in the air? A. Well, just as we came just right there where—

"Q. Was there a hill just south of the place where you next saw the truck? A. I just couldn't say, I wouldn't want to.

"Q. Where were you with reference to the hill which is south of the scene of the accident when you saw that wheel? A. What did you say?

"Q. Where were you with reference to that hill south of the scene of the accident when you saw the wheel go up in the air? A. Oh, we were just right— just coming right over there."

*Cross-examination*

"Q. How far were you from the brow of the hill when you saw the wheel go up in the air? A. I wouldn't know, it just happened so quick and I saw that wheel and that is all."

We now direct our attention to pertinent physical facts and circumstances observed by witnesses after the crash occurred. Before doing so it may be said it appears from the evidence, when considered in its entirety, that the distance from the top of the hill, referred to in the testimony of some of the witnesses heretofore mentioned, and the main street of Carbondale, which is also located on a hill, is 3,200 feet and that the accident occurred between the two hills at a point, about a quarter of a mile south of the Carbondale main street, where the eighteen-foot concrete slab of the highway was comparatively level.

Major Walter Dunn, in charge of the Traffic Division of the State Highway Patrol, happened to be about a mile south of where the accident occurred and heard a call on the radio at 5:46 p. m. regarding it. He drove to the scene immediately and saw two wrecked vehicles on the east side of the highway. The Buick was to the south, facing east, with only one and one-half feet of the rear part thereof on the east edge of the slab. The Ford truck was to the north on the east edge of the highway with the front a little farther to the west than the back, the back portion being off the highway completely while the front was resting on the edge of the pavement. It was twenty-three feet and ten inches from the left corner of the truck to the right rear corner of the Buick. He found that the driver of the truck and two of the occupants of the Buick had been thrown from the vehicles at the time of the collision and subsequently ascertained all three men in the Buick had died, also that Burk had sustained serious injuries and was in a state of what he described as "awful bad shock."

During the course of his examination as a witness Major Dunn was required to go into great detail as to what he had observed and

found following the investigation made by him at the scene of the accident. Many of these details have to do with matters which, our examination of the record convinces us, would be of no avail to appellant if related. For that reason, our review of the remainder of his testimony will be limited to what he had to say regarding marks observed by him on the highway and the vehicles involved in the collision and conclusions reached by him with respect thereto. Touching these matters he testified in substance that he noticed a long skid mark of forty-four feet and three inches made by the left wheel of the Buick starting from the west (or proper lane of travel for that vehicle), running in a diagonal southeasterly direction over to the east lane of traffic where the accident occurred; that there was also a faint skid mark made by the right wheel which the highway patrol had not measured; that he saw a gouge mark in the pavement one and one-half feet west of the center line of the highway and that there were indications it was made by the right rear part of the Buick; that he had examined the vehicles and determined that the first point of impact on the Buick was a dent mark on the back end of the right front fender and that the main damages thereto extended from that point on to the back end of the car; that the right front side of the truck made such dent mark and was the first part of that vehicle to strike the Buick; and that the damage to the truck was on the front part of it and indicated that part had collided head-on with the Buick.

Testifying further this same witness stated that from his observation of the marks on the pavement he was able to determine the point on the highway where the collision occurred and the position of the respective vehicles at the time they collided. He indicated on a plat, alleged to have been drawn to scale, the point on the highway where the collision occurred. So far as our search of the record discloses he was not asked to state how far the point of impact was from any given location. However, it may be said the mark on the plat indicates the point, as fixed by the witness, was in the north bound traffic lane approximately four feet east from the center line of the highway. By placing a toy car on the same plat Dunn indicated the position of the Buick at the moment of the impact. From our observation of the marks made by him on such plat and examination of his testimony with reference thereto it appears such automobile was headed diagonally in a southeasterly direction, more south than east, with the major portion of that vehicle in the north bound lane of traffic and the remainder in the south bound lane. In

response to a question as to which side of the highway the truck was on at that time he answered "mostly on the right side" and then in response to another question indicated that by the term "right side" he meant the east side of the highway.

One other witness, N. D. Lyter, was produced by the appellant with regard to conditions existing immediately after the collision. Much of his testimony was in line with that given by Dunn and so far as it is will not be repeated. With respect to matters not touched upon by Dunn or in conflict with his evidence, this witness testified that his home was located two and one-half blocks north of the scene of the accident and that his kitchen window was on the southeast corner of the house about thirty feet east of the east edge of the highway which ran by his house; that on the date and hour in question he was in the kitchen, heard the crash, and immediately looked out of the south window to the south where he could observe the scene of the accident; that when he looked he saw a big cloud of dust which, with reference to the concrete portion of the highway, "looked like it was right in the center, a little to the right facing south." In response to another question as to what direction the cloud of dust was from the concrete portion of the highway he answered "right on the center, a little west of the center of the highway." This witness also testified that immediately after he observed the cloud of dust he went out of the door on the east side of his house and ran down to the scene of the accident. Then, after testifying substantially as Dunn had testified with respect to marks on the highway described by the latter, he stated in substance that shortly after reaching the scene he observed other marks on the highway some twenty-five paces or more south of the accident. With respect to those marks the record discloses the following questions and answers:

"Q. Please describe those tire marks that you observed to The Court and jury. A. Well where a car had been off the highway, it was muddy, water laying along there, and showed where a car had came off the highway and then whipped back on and mud tracks followed on right across the highway.

"Q. How far did you observe that mud track on the highway? A. Center of the road.

"Q. Now, which side of the road did you observe those marks on? A. East side."

We now come to the question whether the foregoing evidence and inferences, viewed in the light most favorable to appellant as contemplated by the rule to which we referred early in this opinion,

are of such character that reasonable men might reach different conclusions as to whose negligence caused the accident in controversy. If so, under our decisions (See *In re Estate of Modlin*, 172 Kan. 428, 434, 241 P. 2d 692, and other cases cited in West's Kansas Digest, Negligence, § 136 [9] [10], Appeal and Error, § 927 [5], and Trial, § 156 [2] [3]; Hatcher's Kansas Digest [Rev. Ed.], Negligence, §§ 73, 75, Appeal and Error, § 488, Trial, §§ 150, 151) the trial court should have overruled the demurrer and it is our duty to reverse its action in failing to do so.

The gist of contentions advanced by appellees in support of the trial court's ruling on the demurrer is that the record discloses no evidence whatsoever respecting any of the acts of negligence charged by the petition against Burk as existing at the time of the collision, that nothing was shown thereby except that an accident occurred, and that beyond what was shown the appellant's case rests purely upon speculation and conjecture. It may be conceded that if the evidence is entitled to no more import than appellees seek to give it their contention should be upheld. Our decisions so hold. See page 435 of the opinion in *In re Estate of Modlin*, supra, where excerpts from our decisions in *Hendren v. Snyder*, 143 Kan. 34, 53 P. 2d 472, and *Crowe v. Moore*, 144 Kan. 794, 62 P. 2d 846, are quoted at length.

It would serve no useful purpose and we are not disposed to labor the numerous acts of negligence relied on in the petition. It suffices to say that in the state of the instant record we have little difficulty in concluding that so far as subdivisions (*a*), (*b*), (*d*), (*e*) and (*f*) of paragraph 4 of that pleading are concerned their claim has merit and should be upheld. However, their claim with respect to subdivision (*c*) of paragraph 4 of such pleading to the effect Burk drove or permitted his Ford truck to go upon the wrong side of U. S. Highway 75 and into the path of vehicles properly using the west side of such highway, and paragraph 5 of that pleading charging that his negligent and careless acts in driving, swerving, or permitting the truck to enter into and on the wrong side of that highway with the result the driver of the Buick, acting in an emergency, swerved into the east lane of the highway as the only available means to avoid colliding with Burk's truck, presents a far more serious question.

Under our decisions there can be no question that negligence may be established by circumstantial evidence (See, *e. g., Sternbock v. Consolidated Gas Utilities Corp.*, 151 Kan. 81, 98 P. 2d 162,

and cases cited at page 86 of the opinion; *In re Estate of Modlin,* supra), also that the physical facts of a motor vehicle collision may be sufficiently clear to enable the triers of fact to form a judgment of how the collision occurred and who was at fault, although there was no eye witness to the collision (*Sawhill v. Casualty Reciprocal Exchange,* 152 Kan. 735, 107 P. 2d 770).

Long ago this court in *Railway Co. v. Wood,* 66 Kan. 613, 72 Pac. 215, with respect to the sufficiency of circumstantial evidence and touching other matters pertinent to the issue now under consideration, said:

"Circumstantial evidence in a civil case, in order to be sufficient to sustain the verdict of a jury, need not rise to that degree of certainty which will exclude any and every other reasonable hypothesis. The jury are not infrequently called on to decide between two or more theories, and in doing so may exercise their own best judgment in accordance with their oath-bound consciences. This must necessarily be so, for it is the province of the jury and not of the judge to determine whether the evidence better supports this or that theory. We invade their domain if we shall require them to say that a given set of circumstances are as consistent with one theory as with another. This court, in a very recent case (*Railroad Co. v. Perry,* 65 Kan. 792, 70 Pac. 876), had occasion to quote with approval the rule laid down by Professor Greenleaf upon this subject, which is as follows: 'In civil cases it is sufficient if the evidence on the whole agrees with, and supports, the hypothesis which it is adduced to prove.' (Greenl. Ev. § 13a.)

.   .   .   .   .   .   .   .   .   .   .

"It is true, as announced in *Railroad Co. v. Rhoades,* supra, that presumptions may not be based upon presumptions, and that it will not do to consider chance or circumstantial evidence having but a questionable or circumstantial basis of fact, but this is very far from announcing that an undisputed fact may not be used as a basis from which to draw a reasonable conclusion, even though some other and opposite conclusion equally reasonable might also be drawn; otherwise, we might have a condition where a question of fact could not be settled, because the circumstances upon which its settlement depended might point to two or more equally reasonable conclusions. As between two or more reasonable deductions from circumstantial evidence, the court is not at liberty to direct which one the jury shall adopt." (pp. 616 and 617.)

In presenting their claim the evidence is insufficient appellees insist that the admitted evidence of divers witnesses, to which we have heretofore referred, respecting the weaving of Burk's truck back and forth across the center of the highway from a point south of Lyndon to the top of the hill just south of where the accident occurred, was so remote as to be immaterial to the issues and had no reasonable relation to the proximate cause of the accident, hence it was entitled to no weight in disposing of the demurrer. Ordinarily their contention in this regard might be correct as to much

of this testimony. However, that question must be determined in the light of the facts of this particular case. The evidence disclosed a Ford pickup truck loaded with an unusual cargo of from 2,500 to 3,000 elm seedlings, it reveals that from the time such truck was first observed by any witness it was weaving back and forth across the center line of the highway everytime it was seen by any witness up until just a few seconds before the collision, and it shows that when the accident occurred the same truck, driven by Burk, was partially across the center line of the pavement in the wrong lane of traffic. Under such circumstances we think all of this evidence had some reasonable relation to the proximate cause of the accident and that its weight and probative force was a proper subject for consideration by the jury. For decisions which, although they are not on all fours with the case at bar, nevertheless support our conclusion on this point in principle see *Gabel v. Hanby*, 165 Kan. 116, 124, 193 P. 2d 239; *Godsey v. Cox*, 135 Kan. 343, 344, 345, 10 P. 2d 871; *Brooks v. Neer*, 46 Ariz. 144, 47 P. 2d 452; *Melville v. State of Maryland*, 155 Fed. 2d 440; *Glass v. Miller* (Ohio), 51 N. E. 2d 299. For recognized authorities, wherein the general subject is discussed, see 61 C. J. S., Motor Vehicles, 247, § 516 [a]; 5 Am. Jur., Automobiles, 850, § 630; Huddy, Automobile Law [9th Ed], Vol. 15-16, 351, § 184; 9 Blashfield, Cyclopedia Automobile Law and Practice [Perm. Ed], 698, § 6235.

In connection with the same claim appellees urge in effect that witness Lyter's positive testimony, that when he looked out his kitchen window the very moment after the crash occurred he saw the cloud of dust "right on the center a little west of the highway" and that he saw, what from his statements may be fairly inferred to be wet tracks leading from off the east side of the concrete slab to the center of the highway, some twenty-five paces south of the point of the collision, is ridiculous and not to be believed. We readily concede that would be sound and effective argument to have advanced to the jury or to the trial court, while sitting as the thirteenth juror, on the hearing of a motion for new trial. Be that as it may it was not its province to weigh that testimony in passing on the demurrer, neither is it our province to do so in determining the propriety of its ruling on appellate review. That, in our opinion, would be exactly what we would be doing were we to uphold appellees' contentions with respect to such evidence. Therefore we hold its probative force was for the jury and is entitled to consideration on appellate review in determining the issue now under consideration.

Nothing would be gained by further reference to the evidence of record. It suffices to say that when all of it is surveyed and critically analyzed in the light of the principles of law to which we have heretofore referred, particularly portions thereof to which specific reference has been made in the two preceding paragraphs of this opinion, we are impelled to hold, that for purposes of ruling on the demurrer to the evidence, such evidence discloses sufficient probative facts and circumstances that reasonable men in the exercise of fair and impartial judgment might reach different conclusions as to whether the negligence charged in subdivision (c) of paragraph 4 and paragraph 5 of the petition was the proximate cause of the collision resulting in the death of appellant's husband. The result is the demurrer to her evidence should have been overruled.

In view of the conclusion just stated any possible error in connection with the trial court's ruling on the motion for new trial becomes immaterial and need not be considered.

The ruling on the demurrer to the evidence is reversed, the judgment thereafter rendered is set aside, and the cause is remanded for further proceedings.

THIELE, J. (dissenting): In my opinion a jury, considering the plaintiff's evidence most favorably to her, could only speculate and conjecture as to the cause of the death of the decedent, Joseph Edward Briggs, and the trial court's ruling sustaining defendants' demurrer should be sustained.