No. 30,144.

MARY ZUMBRUN, *Appellee*, v. THE CITY OF OSAWATOMIE, *Appellant*.

(10 P. 2d 3.)

Opinion filed April 9, 1932.

*Frank M. Sheridan, Bernard L. Sheridan,* both of Paola, and *L. Perry Bishop,* of Osawatomie, for the appellant.

*Jabez O. Rankin,* of Paola, for the appellee.

The opinion of the court was delivered by

DAWSON, J.: This was an action for damages against the city of Osawatomie for the death of Lloyd E. Zumbrun, who was electrocuted in the attic of a two-story building while engaged in changing the position of a drop light to serve the convenience of a doctor whose office was immediately below.

The principal facts were these: For some time prior to the summer of 1927 the city of Osawatomie owned and operated an electric light plant which served the town and its inhabitants. The system of wiring which supplied the current was "a single-phase, three-wire, 220-volt, secondary system." In this sort of system there are three-fold sets of wires which radiate from a transformer, and each set furnishes current to a particular group of buildings. In each of these threefold sets, two of the wires are charged with electricity— "hot wires" the workmen call them—and one wire which is neutral. To get a lighting current one of the hot wires is connected with the neutral. The function of the transformer is to reduce the higher voltage coming from the dynamos of the power plant to 110, which constitutes the usual strength of current used for lighting purposes. Some years ago this sort of system for distributing electric light and power was common, but in recent years it has been found that the neutral wire should be methodically grounded to guard against accidental contact with current of higher voltage. The city's distributing system did not conform to this later and safer practice of grounding the neutral wire in each threefold set.

On July 2, 1927, one Doctor Pool, a tenant on the second floor of

a certain business building in Osawatomie, telephoned to one Otis Pierce, who was engaged in the business of furnishing electric supplies and services, that he desired an extension electric light hung in front of his operating chair. Pierce sent his employee, Zumbrun, to attend to it. Zumbrun arrived and with the aid of a stepladder he climbed through a ceiling hatchway into the attic, where he made some effort to make the requisite connection. Then he descended into the hallway near the doctor's office and reported that he had fixed the desired connection and went away. Shortly afterwards Doctor Pool tried to turn on the light, but it would not work, so he telephoned that fact to Pierce. This telephone statement brought the response that a man would be sent over immediately to fix it. Soon Zumbrun reappeared, tried the electric bulb, which would not work. He then tried it in another socket, but it gave no light there. So he remounted the ladder and passed into the attic. Doctor Pool soon noticed that all sounds in the attic had ceased. He called a fellow tenant, Clarence Chambers, who climbed the ladder and looked into the attic and spoke to Zumbrun, but got no response. The Pierce shop was notified; Pierce appeared and climbed into the attic; he caught hold of Zumbrun's hand and received an electric shock which partly stunned him. Pierce then descended the ladder and went to the switch block in the hallway and turned off the current. Some other men climbed into the attic, and found Zumbrun's dead body lying on the rafters within two feet of the ceiling, with one wrist lying on an electric wire and one ankle on a gas pipe which apparently had made a connection for the electric current to pass with fatal results through Zumbrun's perspiring body and sweaty clothing on that hot July day.

Plaintiff, as widow of Zumbrun, brought this action on her own behalf and that of her minor daughter against the defendant city. Her petition charged that Zumbrun's death was caused by the city's negligent failure to ground the neutral wire to prevent the threefold set of wires from carrying an excess current into the building. Her petition alleged:

"That the service so maintained to supply electric current to said buildings is known as single-phase, three-wire, 220-volt construction, there being two service wires carrying current and a neutral wire. . . .

"Plaintiff alleges that in order to insure safety to property and life it is necessary according to approved methods of construction and in the proper construction of said electric system, that the said neutral wire should be properly grounded. . . .

"Plaintiff further alleges that on July 2, 1927, and for a long time prior thereto, the said neutral wire above mentioned, was not grounded and that one of the service wires at that time carried more than 220 volts of electric current.

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

"Plaintiff further alleges that the defendant city was negligent in not having said neutral wire properly grounded and in maintaining and permitting its service wire to carry a high and dangerous voltage of electricity, and that the death of said Lloyd M. Zumbrun was directly caused by the said negligence of said city."

Defendant's answer, among other matters, pleaded a city ordinance, entitled: "An ordinance relating to the registration of electricians, regulating inside wiring and providing a penalty for the violation thereof." This ordinance made it unlawful for any person to install or alter any electrical wiring without a permit from the city, good for one year, which Zumbrun did not have. The ordinance excused employees of an electric supply and service shop from having such a permit if their employer had one; but Pierce, Zumbrun's employer, did not have such a permit. The ordinance also provided that no alterations of inside wiring or the attaching of devices using electric current should be made without a permit from the superintendent of the light department, and such work had to be done under the direction of the superintendent. This provision of the ordinance was ignored by Zumbrun and his employer. Under the ordinance city employees and persons wiring their own buildings under the rules and regulations of the ordinance were not required to have a permit. Misdemeanors for breach of the ordinance were defined and penalties prescribed.

Defendant's answer also alleged that Zumbrun met his death while committing a breach of the city ordinance. Defendant also pleaded Zumbrun's contributory negligence. Its answer on this point, in part, alleged—

"That the said Zumbrun was further negligent and careless in undertaking to do the acts mentioned in the plaintiff's petition with reference to the electric wires therein described without first unscrewing the fuses and removing the same so as to shut off the electric current on the wires when he first entered the building before climbing to the attic at the point where he was to be engaged in the chores described in plaintiff's petition, which he could have easily done and which it was his duty to do before undertaking any of the acts described in plaintiff's petition with reference to the said electric wire and thereby he would have avoided every possibility of any injury from any voltage."

Jury trial; long record; many witnesses pro and con testified.

The jury returned a verdict for $4,000 in favor of plaintiff; judgment was rendered thereon, and the city appeals.

1. The first error urged relates to the overruling of defendant's demurrer to plaintiff's evidence. Defendant stresses the fact that Zumbrun was an electrician regularly engaged in the sort of work he was doing when he met his death. He had been employed by Pierce for over a year and was familiar with the city's electrical system, and according to Pierce's testimony Zumbrun had been explicitly instructed that the neutral wire was not grounded and the danger of accidental grounding had been explained to him. Many witnesses for defendant testified that any electrician could tell from a mere glance at the wiring system that the neutral was not grounded; and defendant makes the contention that the fact which was wanting to sustain the judgment when this case was here before (*Zumbrun v. City of Osawatomie,* 130 Kan. 719, 288 Pac. 584) was thoroughly established by the proof in the second trial now under review. In the former opinion it was said:

"It may be conceded that the handling of electric wires while the current is on involves danger and that one so engaged should exercise such care as the danger of the surroundings would suggest to a man of ordinary prudence. As to the contention that Zumbrun should have known that there was no grounding of the wires at the transformer, the evidence does not show that he did know, and as the case was presented presumptions cannot be indulged against him. In the absence of evidence of knowledge he would be warranted in assuming that the plant was properly constructed." (p. 724.)

The point is emphasized that in this trial Pierce, whose testimony showed that Zumbrun had been instructed that the neutral wire was not grounded, and had the danger of the system explained to him, was plaintiff's witness. Another witness for plaintiff testified that Zumbrun had taken down some wiring and did some re-wiring for him and hooked up a power motor in the laundry of the witness. The significant part of his testimony reads:

"Q. Did you notice anything as to whether he (Zumbrun) took out the fuse or stopped the current on the work? A. He did."

The testimony of other electricians, of whom there were several, was all to the effect that the proper thing for Zumbrun to have done was to have switched off the current or to have taken out the switch plugs before he climbed into the attic, and that he would thereby have been perfectly safe from any danger of electricity. It was also shown that the switch box was just a few steps along

the hallway from where he climbed into the attic, and that it was the simple work of a moment to perform that operation. There was, however, considerable testimony that electricians often took the risk of working with electric wires without turning off the current, but they all knew the safe and proper way such work ought to be done.

It is on this state of the evidence that defendant makes the contention that Zumbrun's contributory negligence was incontestibly established. A majority of this court holds otherwise—that the testimony of Pierce was not necessarily true, and even if its truth be conceded because Pierce was plaintiff's witness, nevertheless it was a jury question whether Zumbrun was guilty of contributory negligence. Apparently before Zumbrun went into the attic the first time he turned off the switch, since that was the proper thing to do and he was not injured on that occasion. Perhaps he may have forgotten to do so the second time. But there is good authority for the view that temporary forgetfulness of a known danger does not necessarily constitute contributory negligence as a matter of law. In 45 C. J. 959 it is said:

"Expressions are found in many decisions to the effect that one who voluntarily exposes himself or his property to a known and appreciated danger is guilty of negligence; but while an important factor to be considered in all cases, it is generally held that the fact that one knew and appreciated, or in the exercise of ordinary care should have known and appreciated the danger, and voluntarily encountered it, does not necessarily show negligence."

In 20 R. C. L. 111 it is said:

"When, however, the specific evidence submitted only goes to the extent of establishing knowledge of the defect, the question of his contributory negligence should not be withdrawn from the jury. Indeed, it can only be in rare cases, if ever, that the question becomes one of law. In other words, it is for the jury to determine whether knowledge of the physical characteristics of the offending instrumentality constituted a sufficient warning of peril to the plaintiff."

2. It is next contended that there was a total failure of evidence to establish plaintiff's allegation that a current of 220 volts of electricity passed through the body of Zumbrun. The severe shock which Pierce received when he climbed into the attic and took Zumbrun by the hand was some evidence of considerable voltage; and the test made by the witness Armour, foreman of electrical service in Fort Scott, showed that he "got a reading of 230 volts" on one of

the "hot wires," in another building, and 220 volts and 110 volts in corresponding readings in the building where Zumbrun was killed. Objection is made to this testimony because these tests were made some days afterwards, but there was nothing to show that conditions had changed in the interim, and the error assigned on want of evidence to sustain this allegation of plaintiff's petition cannot be sustained.

3. Fault is found with several of the court's instructions to the jury. In one of these the court said that "the particular act of negligence charged is that the city did not have the neutral wire grounded in connection with its distribution system." This was merely a simplified statement of the pertinent allegation of the petition. The trial court's definition of contributory negligence is also criticized, but we see nothing in it prejudicial to defendant. The fifth instruction read:

"A party which owns and operates an electric light plant and furnishes an electric current for light to his patrons is required to exercise such care as will prevent injury to its patrons and others. And a party thus engaged in the business of distributing such a dangerous element as electricity is bound not only to know the extent of the dangerous element it is distributing, but it is bound to use the highest degree of care which skill and foresight can obtain in order to avoid injury to all persons who may be lawfully in proximity to the equipment which supplies the electrical current, and also to those who are liable to come accidentally in contact with such equipment."

Defendant makes two objections to this instruction. It declares it to be the law that the defendant owner of an electric power plant is required to exercise *such care as will prevent* injury to its patrons and others. Defendant contends that no statute or rule of court heretofore announced places so exacting a burden upon the owner of a power plant; that to say that such care is required to be exercised *as will prevent* injury prescribes a standard impossible of attainment and would result in making the operator of a power plant an insurer. The second criticism of this instruction pertains to the requirement that a distributor of electric current "is bound to use the highest degree of care which skill and foresight can attain to avoid injury to persons." This latter part of the instruction was a correct statement of law under our own precedents. In *Stone v. City of Pleasanton,* 115 Kan. 378, 223 Pac. 312, the standard of care required of a city which operates an electric power plant was stated thus:

"A city owning and operating an electric lighting system within its limits is under obligation to use the highest degree of care, including insulated wires where necessary, in making the lighting system safe for all in the city." (Syl. ¶ 8.)

In *Snyder v. Light Co.,* 98 Kan. 157, 160, 157 Pac. 442, it was said:

"It is conceded that a party who conducts so powerful and destructive an agency through the streets of a thickly populated part of a city is bound to exercise a degree of care commensurate with the dangerous character of the agency to protect those who may come in contact or even in close proximity with its wires. The highest care and utmost caution should be exercised for the safety of the public, including those engaged in business or play, and for the protection of thoughtless, curious and inexperienced children, as well as those who have reached maturity. [Citations.]"

The court holds that when the entire text of the fifth instruction is considered, the phraseology of the first part of it which would require "such care as will pervent injury," although inaccurate, was not prejudicial, especially since counsel for defendant did not regard it as of sufficient gravity to make a timely request in the trial court to have it modified. (*Lambert v. Rhea,* 134 Kan. 10, 4 P. 2d 419.)

Error is also assigned on the trial court's refusal to give certain instructions requested by defendant. In one of these the court was asked to instruct the jury that plaintiff claimed that her husband was killed by a current of 220 volts and that if the neutral wire had been properly grounded the other wires would carry only 110 volts, and that such voltage would not be dangerous to life. While there was testimony that 110 volts would be dangerous to a perspiring workman in the cramped position between the joists and rafters where Zumbrun lay while changing the connection for Doctor Pool's drop light, there had been no issue on this point raised in defendant's answer. The instructions which the trial court did give made it clear that before defendant would be liable for the death of Zumbrun it was necessary for plaintiff to show that it was negligence for the city to omit to ground the neutral wire and that such failure or omission caused the death of Zumbrun. We think this was sufficient.

Defendant next complains of the trial court's refusal to instruct the jury relative to the effect of the breach of the city ordinance on the rights of Zumbrun and his personal representative. This point might be serious if it had been shown that the breach of the ordinance had anything to do with the death of Zumbrun, but no such showing was made, nor did the circumstances warrant such an in-

ference. It is not suggested that if Zumbrun had applied for a permit or if his employer had done so, the city would have investigated his competency to work on electric wires and services and might have denied him a permit for want of the requisite skill. It is familiar law that where there is no causal connection between the breach of a statute or city ordinance and the wrong or injury complained of, its violation does not bar a recovery. (*Williams v. Electric Railroad Co.*, 102 Kan. 268, 271, 170 Pac. 397; *Griffith v. Atchison, T. & S. F. Rly. Co.*, 132 Kan. 282, 286, 395 Pac. 687; 45 C. J. 902-905.)

Another error pressed on our attention relates to the instruction given by the court touching the measure of damages. It reads:

"The plaintiff herein, the widow of Lloyd Zumbrun, has no right of recovery herein that would not inure to her husband had he been only injured instead of killed. In other words, the plaintiff, as widow of the deceased, has no added rights of recovery of damages against the defendant city than the deceased, himself, would have had in event that he had survived the shock and had brought an action against the city in damages for an injury sustained thereby. And the plaintiff in this action is limited to all of the defenses that could or might have been urged against the deceased in an action for damages by him against the defendant herein for an injury caused to him by the circumstances and the means which in fact caused his death.

"And on the other hand, if the deceased had survived the shock and could have held the defendant city in damages for any injury received thereby through the fault of the defendant, then in that event, under our law, the widow of the deceased may recover against the defendant for damages for the death that was caused by the circumstances and means which caused the suggested injury."

Defendant suggests an inaccuracy in this instruction, in that it permits the jury to infer that plaintiff had all the rights of recovery which Zumbrun himself would have had, such as damages for pain and suffering. Defendant insists that the widow and orphan's rights of recovery were limited to compensatory damages only. But there was no evidence of any damages such as pain and suffering which would have been peculiar to Zumbrun and recoverable only by himself if he had lived. And it cannot be presumed that the jury made any allowance for damages neither proven nor even suggested; and, indeed, the modest verdict for $4,000 precludes the idea that any improper item of damages was included in the verdict. The court holds that any inaccuracy in this instruction was nonprejudicial.

The other errors assigned relate to the trial court's failure to direct

a verdict for defendant and to the overruling of the motion for a new trial. These have been considered, but as their importance is chiefly predicated on the errors already noted and ruled on they require no discussion.

The court holds that prejudicial error is nowhere shown in this record, and the judgment is therefore affirmed.

DAWSON, J., dissents, being of the opinion that Zumbrun's contributory negligence was conclusively established, and that judgment in favor of the city should be ordered.