No. 40,348

In the Matter of the Estate of Clark J. Armstrong, also known as C. J. Armstrong, deceased. (ARLEY D. HAGA, *Appellant,* v. HAROLD L. MOSS, Administrator of the Estate of Clark J. Armstrong, deceased, *Appellee.*)

(311 P. 2d 281)

Opinion filed
May 11, 1957.

*Payne H. Ratner, Jr.,* of Wichita, argued the cause and *Payne H. Ratner, Louise Mattox, Russell Cranmer, Dale B. Stinson, Jr., Cliff W. Ratner, William L. Fry, A. Wayne Murphy, Ray A. Overpeck, Bernard V. Borst, D. Clifford Allison, Gerald D. Lasswell,* all of Wichita, and *E. E. Pedroja,* of Eureka, were with him on the briefs for the appellant.

*Harold G. Forbes,* of Eureka, argued the cause and *Thos. C. Forbes* and *George Forbes,* both of Eureka, were with him on the briefs for the appellee.

The opinion of the court was delivered by

HALL, J.: This was an action to recover damages for negligence in the operation of an automobile. The trial court sustained a demurrer to the evidence and the plaintiff appeals.

No important issue is raised as to the pleadings.

This action was filed in the probate court by a petition of demand against decedent's estate with appropriate request that the matter be transferred and tried in the district court pursuant to G. S. 1953 Supp., 59-2402a. The answer is a written defense to the allowances of the claim in demand against the estate.

In summary the petition alleged the plaintiff was proceeding west on a county road north of Eureka, Kansas. Loose gravel was piled parallel to the north shoulder of the road forming a ridge 4 to 5 feet wide and 1½ to 2 feet high. The weather was clear. While the petitioner was proceeding westerly along the road and occupying the north half, or right hand, of the roadway the automobile operated by the decedent approached from the west proceeding east. The decedent's automobile suddenly turned to the

left, or north, and crossed the center line. The accident resulted. The petition also alleges the decedent was 79 years old and suffered infirmities and disabilities.

The written defenses denied generally and specifically allegations of the petitioner and set up the contributory negligence of petitioner.

Upon these issues joined, the matter came on for trial to a jury. The plaintiff introduced his evidence and rested. The defendant demurred to the evidence and, after consideration of argument on the issues raised by the demurrer, the court sustained the demurrer, discharged the jury and disallowed plaintiff's claim against the estate of defendant with costs to the plaintiff. After overruling of post trial motions, plaintiff takes this appeal.

Plaintiff and appellant makes five specifications of error but urges only a consideration of the demurrer to the evidence.

Following the well established rule of this court, a consideration of such demurrer requires a review of the evidence to determine whether or not there was sufficient evidence to support the cause of action of the petitioner.

An examination of the plaintiff's evidence shows:

There were no eye witnesses to the accident other than the petitioner.

In support of the petition plaintiff introduced the testimony of Mr. Edward E. Arnold. Mr. Arnold testified that he worked on an oil lease near the scene of the accident and drove the road where the accident occurred twice a day five days a week. On the day of the accident he was driving the road and came up behind decedent's car. He said, "There were two people in this automobile and I drove up behind them. They were going down the road and on the left side of the road part of the time and part of the time they would be on the right side. I didn't know what side he was going to drive on. I judge they were driving around 20 miles an hour. . . ." He attempted to pass decedent but decedent did not respond to his horn.

"Q. Did you honk it just once?
"A. No, continuously.
"I started to honk as soon as I started down the big hill. That was before I got to the intersection. After I got to the intersection I kept following this car, I wanted to get by and he never did get over."

Arnold went on to say that he could observe perfectly as he had

perfect vision. As he started around decedent's car, "the car was three feet over on the left side of the black center line and he had to slow his car down and put it in second gear, straddling clear over the gravel bar, the wheels being clear on the left side of the road and possibly up the gravel bar, the wind row, to get around Armstrong."

Arnold further testified that he could see several cars coming from the east, one of which was the Haga car.

"As I went around this car (decedent's), this '49 black Chevrolet, I seen two elderly people, one a lady and one a man. The man was driving, I seen a cane between the man and the lady. . . ."

A Mr. John Runyan testified next for plaintiff. He was also an oil worker on his way home. He testified that he met the Armstrong car.

"Q. After you passed, or after you got by the first automobile you met on this route which was west of the driveway, did you then meet another car approaching in an easterly direction while you were going west?

"A. Yes.

"He was over too close to our side of the road and we had to pull up in the edge of the gravel to get around him there. It was two-tenths of a mile west of the Groom's drive-way where we got by the second automobile.

. . . . . . . . . . . . .

"The Court: Which car was it you met when you were two-tenths of a mile west of the Groom driveway?

"A. Well, as near as I know, it was the Armstrong car. It was the second one we passed."

Mr. Runyan was followed by a Mr. Al Baumgardner and a Mr. Merle Braymer both of whom were oil field workers and testified that they were traveling over the road at the approximate time of the accident and as to the condition of the road. Mr. Baumgardner testified that he too met a car which "was driving pretty much on his side of the road and that he pulled over into the gravel ridge a foot or more".

Mr. Braymer testified that Mr. Haga passed him and at that time Mr. Haga's speed did not seem unusual.

Mr. Charles B. Williams, Highway Patrolman, then testified that he arrived at the scene at 5:26 p. m. He said:

"The vehicles had not been moved. . . . The traveled portion was exactly 20 feet. The center of the traveled portion at that time was exactly 10 feet. . . . The vehicles were 9 feet apart. 7 feet 10 inches from the edge of the gravel winrow to the left rear wheel of the Armstrong vehicle. There were no skidmarks behind the Armstrong vehicle when I arrived. Skid

marks behind the Haga vehicle were 30 feet. The left skidmarks of the Haga vehicle were 10 feet from the south edge of the gravel. The rear of the Haga vehicle swung very sharply to the north and the rear wheels struck the gravel winrow and it stopped. The entire front of both vehicles were damaged by the impact but the impact was on just about four-fifths of both automobiles. Of course, they pulled left to right.

⋅ ⋅ ⋅ ⋅ ⋅ ⋅ ⋅ ⋅ ⋅ ⋅ ⋅ ⋅

"Q. Was there anything at all from your investigation on that road or anything would prevent, as far as you could see the Armstrongs using the south half of the traveled portion of the road.

"A. No, it was clear."

The counter abstract includes the following testimony of Trooper Williams:

". . . the road was twenty-six feet wide and along the north side there was a gravel windrow which reduced the travel portion to twenty feet; the Armstrongs were driving a 1949 Chevrolet car and Haga was driving a 1953 Chevrolet car, and that the width of said cars was approximately six feet; 'Exhibits Five and Six' are scale models of the Armstrong and Haga cars, the Armstrong model being marked 'A' and the Haga car being marked 'H'; at the request of plaintiff's attorneys the highway patrolman drew an outline of the Haga car and the Armstrong car on plaintiff's 'Exhibit Two', which represented the position of the vehicles in the road immediately following the collision; after the accident the vehicles were nine feet apart; the left rear wheel of the Armstrong car was seven feet ten inches from the edge of the gravel windrow on the north side of the highway; the right rear wheel of the Haga vehicle was in the windrow; there were skid marks behind the Haga vehicle for thirty feet which ran parallel with the road, the south skid mark being ten feet south of the south edge of the windrow; there were no skid marks by the Armstrong vehicle; at the time of the impact the rear of the Haga vehicle swung sharply to the north and stopped; and the Armstrong car was knocked back west and slightly south for a distance of nine feet;

⋅ ⋅ ⋅ ⋅ ⋅ ⋅ ⋅ ⋅ ⋅ ⋅ ⋅ ⋅

"The entire front of both vehicles was damaged, but the impact was just on the left four-fifths of the front of both automobiles, which would leave the right fender escaping the initial impact.

"Q. On this print, does it show the true center line of the highway?

"A. You mean the black line of the right of way, yes.

"Q. And that center line shows how much of the surface of the road was south and how much of the surface of the road was north?

"A. That is correct.

"Q. How much does it show each way?

"A. In my opinion, it would be about thirteen feet. I don't know what it shows there. Twenty-six feet is the width.

"Q. So actually from the true center line there is thirteen feet to the north and thirteen feet to the south.

"A. That is correct.

"Q. On the north side, thirteen feet, which is the right hand side of the road, there is this windrow of gravel you testified to?

"A. Yes.

"Q. And that windrow of gravel, including what is north of the windrow of gravel, it takes up approximately six feet, is that right?

"A. Yes.

"Q. That leaves a balance of seven feet between the true center line of the road and the south edge of the gravel?

"A. That is right.

"Q. How wide is a car?

"A. Approximately six feet.

"Q. So there was actually room between the true center line of the road and the south edge of the gravel for a car to drive?

"A. Yes.

"Q. Without extending or using any of the south portion of the true highway?

"A. That is correct.

"Q. Where the cars came together, if you can see your plat, these skid marks you showed on the map as being the skid marks of the Haga car, how far is the south skid mark south of the true center line of the road?

"A. That would be three feet.

"Q. Three feet south of the true center line?

"A. Yes."

Plaintiff then called a Mr. Ernest Grooms who testified concerning Mr. Armstrong's infirmaties and disabilities. He testified:

". . . I had ridden some with Mr. Armstrong for some years prior to January 12, 1954. Mr. Armstrong used a cane to walk with. He walked a little lame. It was his right leg. I observed the manner Mr. Armstrong applied the brakes on his car during the times I had ridden with him. I believe if I remember right, he took his foot off the foot feed and put it on the brake. Mr. Armstrong had used his cane for a couple of years, if I am not mistaken. The last time I saw him I think maybe when he walked he was using a cane. He limped some then, too. His condition was about the same as it was the last time I rode with him. His condition stayed about constant."

The court sustained objection to other testimony of Mr. Grooms.

A Dr. Henry O. Marsh then testified in behalf of plaintiff's injuries.

Plaintiff's final witness was Mr. Kenneth Razak, Dean of the School of Engineering, University of Wichita, who in answer to a hypothetical question reconstructed the scene of the accident and testified as follows:

"Now, assuming those facts which I have given you before in order to work on this problem, assuming those facts, is there anything you can compute in the way of deceleration forces or angle of impact of the vehicles?

"A. I have taken these photographs you have furnished me and attempted to reconstruct the actions of the automobiles at, during and immediately follow-

ing the impact and I have a diagram together with some scale cards which I would like to use, whatever help it will be in explaining to the jury.

.   .   .   .   .   .   .   .   .   .   .   .   .   .

"Q. Is it possible from the facts given to determine anything regarding realtive speed of automobiles at the time of impact?

"A. Yes.

"Q. Can you tell us how you do that and what conclusion you arrive at?

"A. Knowing the fact that the car of Armstrong slid nine feet, as I believe that is in the record, and came to rest at this point; and knowing the amount of frinction (sic) between the wheels and roadway, I can compute the initial velocity of the Armstrong car at the time it left, or shall we say separated from the Haga car.

"Q. Would you give us your opinion and tell us a little bit how you arrive at it?

"A. My computation indicates that the Armstrong car separated from the Haga car while traveling at about nine and a half miles an hour. In other words, it would have slid nine feet if it had an initial velocity of about nine and a half miles per hour.

"That means the Armstrong car was going 9.5 miles per hour in this direction when it separated from the Haga car after the collision.

"The maximum difference in velocity between the Armstrong car and the Haga car initially would have been twice the speed of the Armstrong car backward at the time it separated or two times nine and one-half or 19 miles per hour.

"I computed at the time of the impact the left rear wheel of the Armstrong car would have been approximately three and a half feet from the south edge of the gravel ridge.

"My reconstruction of the accident shows the Armstrong car must have been turning to the right and had already turned to a small angle to the right. Therefore, at some time previous to the accident it must have been further to the left side of the road because it had already turned to the right."

Other pertinent testimony in the counter abstract is as follows:

"12. The Armstrong car was traveling east at the rate of ten to fifteen miles per hour and was crowding the center of the road.

.   .   .   .   .   .   .   .   .   .   .   .   .

"14. In meeting and passing the Armstrong car, Bumgardner crowded the edge of the gravel but did not have any difficulty in passing; and at said time the Armstrong car was approximately eighteen inches south of the south edge of the Bumgardner car.

"15. The Haga car met the Armstrong car headon ninety-six feet west of the Grooms' driveway.

"16. Bumgardner was driving approximately forty to forty-five miles per hour.

"17. The road at the place of the accident was twenty-six feet wide; the gravel ridge was four and one-half to six feet wide and the north half of the road after deducting the six feet maximum measurement for the travel ridge was seven feet wide.

"18. Haga's car was a Chevrolet approximately six feet wide.

"19. There was ample room on the north half of the highway for Haga to drive his car without using any of the south half of said gravel road.

"20. At the time of the accident the skid marks of the Haga car were exactly ten feet from the south edge of the gravel road or a total of three feet south of the center line of said gravel road.

"21. Haga had skidded the wheels of his car for thirty feet, which skid marks were due east and west down the center of the road; and four-fifths of the left frontend of each car collided in the accident which resulted in the death of Armstrong and his sister, and the injuries to Haga.

"22. There were no skid marks behind the Armstrong car; the impact caused the Haga car to come to an abrupt stop with its rearend swinging into the edge of the gravel ridge on the north; the Armstrong car bounced back west and a trifle south, a total of nine feet; the road was level and vision was unobstructed for approximately one-half mile at the place of the accident; and immediately after the accident highway patrolman, Trooper Williams, was called and he arrived at the scene of the accident before the vehicles had been moved."

The court sustained defendant's demurrer to the evidence on these grounds stated in the Journal Entry:

"1. That the evidence did not show Clark J. Armstrong to be negligent.

".2. That said evidence showed that claimant, Arley D. Haga was guilty of contributory negligence."

In sustaining the demurrer the court said:

"It is unfortunate that this man was terribly hurt, there isn't any question about it, but the question here is whether he contributed anything to his own injury and if by his conduct he has contributed to his own injury, then this demurrer must be sustained.

.  .  .  .  .  .  .  .  .  .  .  .

"I think from this evidence this old gentleman was wobbling around the road, like we have seen drivers do. That is probably one tragedy of an old person trying to drive an automobile; things like this are liable to happen. On the other hand, here is Mr. Haga, who was possessed of all his faculties, strong, healthy man at that time—"

In the argument on demurrer the court said:

"If that is all the difference, you showed where he was down the road 100 yards, what difference would it make where he was on the road a 100 yares (sic) or quarter mile away if he was where he shouldn't be, or *the court thinks he was where he shouldn't have been at the time of contact.*" (Emphasis ours.)

In presenting the appeal to this court, counsel for defendant admitted the negligence of Armstrong. He said:

"In the instant case there would appear to be little *question but what Armstrong was guilty of negligence.* He was crowding the center line and had been partially on the wrong side of the road during all the time that it had taken him to drive from the corner west to the place of the accident. The evidence is

also uncontradicted that although Armstrong was only driving 10 to 15 miles per hour he never put on his brakes prior to the time of the collision. . . ." (Emphasis ours.)

The ground rules on the consideration of the evidence under demurrer are well established by this court. In *Brent v. McDonald,* 180 Kan. 142, 300 P. 2d 396, the court said:

". . . Suffice it to say that careful and extended review of the record has been made and in conformity with our long-established rule, that in reviewing a ruling upon a demurrer to the evidence, this court does not weight or compare contradictory evidence but accepts all evidence as true and gives it the benefit of all presumptions and inferences that may properly be drawn therefrom and considers only such portion thereof as is favorable to the party adducing it (*Nigh v. Wondra,* 167 Kan. 701, 208 P. 2d 239; *Messinger v. Fulton,* 173 Kan. 851, 252 P. 2d 904; *Briggs v. Burk,* 174 Kan. 440, 442, 257 P. 2d 164; *Siegrist v. Wheeler,* 175 Kan. 11, 259 P. 2d 223; *Spencer v. Supernois,* 176 Kan. 135, 268 P. 2d 946; *Stephens v. Bacon,* 176 Kan. 460, 461, 271 P. 2d 285; *Maust v. Ioerger,* 177 Kan. 558, 280 P. 2d 566; and other decisions to the same effect listed in West's Kansas Digest, Appeal & Error, § 927 [5], Trial, § 156 [2] and [3]; Hatcher's Kansas Digest [Rev. Ed.], Appeal & Error, § 488, Trial, §§ 149 to 151 incl.) . . ."

Likewise in *Krey v. Schmidt,* 172 Kan. 319, Syl. 1 and 2, 240 P. 2d 153:

"On a demurrer to evidence courts do not consider conflicting evidence on direct and cross-examination of the same witness but only evidence favorable to the party adducing it.

"Inferences from evidence favorable to a demurring party are not indulged in his behalf. On the contrary all inferences are construed in favor of the party whose evidence is so challenged."

In the decision the court further said on page 325:

"Although there are some rather strong inferences in the instant case which might be drawn in favor of appellants courts are not permitted to consider them on demurrer. Only inferences favorable to the party against whose evidence the demurrer is directed may be considered. (*James v. Grigsby,* 114 Kan. 627, 634, 220 Pac. 267; *Meneley v. Montgomery,* 145 Kan. 109, 110, 64 P. 2d 550.) . . .

"Irrespective of what courts may believe about the evidence they are bound to accept it as true when challenged by demurrer. . . . No rule is better established than the one that courts will not consider or weigh conflicting evidence on direct or cross-examination of a witness. We, therefore, conclude the court did not err in overruling the demurrer to appellee's evidence."

To sustain a demurrer to the evidence the negligence or contributory negligence must clearly appear from the evidence introduced. *Most v. Holthaus,* 170 Kan. 510, 513, 227 P. 2d 144:

"That a plaintiff's negligence, or his contributory negligence, will bar him from recovery in an action for damages sustained in an automobile casualty and that *a demurrer to his evidence should be sustained where either negligence or contributory negligence clearly appears from his evidence cannot be questioned.* (*Dolloff v. City of Wichita*, 147 Kan. 63, 75 P. 2d 221; *Crowder v. Williams*, 116 Kan. 241, 226 Pac. 774; *Hanabery v. Erhardt*, 110 Kan. 715, 205 Pac. 352; *Houdashelt v. State Highway Comm.*, 137 Kan. 485, 21 P. 2d 343; *Moler v. Cox*, 158 Kan. 589, 149 P. 2d 611.) . . ." (Emphasis ours.)

In applying the ground rules to this case, we believe the court did not follow them in sustaining the demurrer to the evidence. To sustain the demurrer on the grounds that Armstrong was not negligent and that Haga was contributorily negligent required the court to weigh conflicting testimony on both direct and cross-examination of the witnesses. In fact it is difficult to determine how the court absolved Armstrong from negligence in the light of its own statement that "the old gentleman wobbled around the road." That reasonable minds would differ on the testimony is certainly borne out by the fact that defendant's counsel admits negligence notwithstanding the finding of the court to the contrary.

Many similar factual situations have been before this court and the court has held such questions of fact as were raised by plaintiff's evidence should go to the jury. A leading case is *Sawhill v. Casualty Reciprocal Exchange*, 152 Kan. 735, 107 P. 2d 770:

"Appellants argue that their demurrer to plaintiff's evidence should have been sustained. It is true, as argued on their behalf, the simple fact a collision occurred and someone was injured or some damage done, standing alone, will not support a verdict. There must be substantial, competent evidence of defendant's negligence which caused the injury. (*Hendren v. Snyder*, 143 Kan. 34, 53 P. 2d 472; *Crowe v. Moore*, 144 Kan. 794, 62 P. 2d 846.) It also is true that when plaintiff rested his case no one had testified who had been an eyewitness to the collision. But the testimony of eye-witnesses is not always essential. Evidence of physical facts and circumstances may be sufficient. Here there was substantial, competent evidence that the collision occurred in the northeast quarter of the intersection, a place where plaintiff, driving north, had a right to be, and where the defendant Hubert, driving east, should not have been. There also was evidence that the right front corner of defendant's truck struck the side of the plaintiff's car with such force as to drive the car diagonally into the cement abutment, breaking it down. We think this evidence sufficient to have sustained a finding by the jury that the collision and resulting damages to plaintiff resulted from defendant's negligence."

The Sawhill case was followed in *Briggs v. Burk*, 174 Kan. 440, Syl. 1, 257 P. 2d 164:

"Following *Sawhill v. Casualty Reciprocal Exchange,* 152 Kan. 735, 107 P. 2d 770, and other decisions cited in the opinion, it is *held,* the physical facts and circumstances of a motor vehicle collision may be sufficiently clear to enable the triers of fact to form a judgment of how the collision occurred and who was at fault, although there was no eye witness to the collision."

In the decision the court further said:

"Under our decisions there can be no question that negligence may be established by circumstantial evidence (See e. g., *Sternbock v. Consolidated Gas Utilities Corp.,* 151 Kan. 81, 98 P. 2d 162, and cases cited at page 86 of the opinion; *In re Estate of Modlin,* supra), also that the physical facts of a motor vehicle collision may be sufficiently clear to enable the triers of fact to form a judgment of how the collision occurred and who was at fault, although there was no eye witness to the collision. . . ." (p. 450.)

Likewise the question of negligence or contributory negligence was not clearly shown in plaintiff's evidence and should have gone to the jury. In *Hogan v. Santa Fe Trail Transportation Co.,* 148 Kan. 720, 85 P. 2d 28, the court said:

" 'In testing the sufficiency of evidence as against a demurrer, the court shall consider all of plaintiff's evidence as true, shall consider that favorable to plaintiff, together with all reasonable inferences to be drawn therefrom and disregard that unfavorable to plaintiff, and shall not weigh any part that is contradictory, nor weigh any differences between his direct and cross-examination, and, if so considered, there is any evidence which sustains the plaintiff's case, the demurrer should be overruled.

" 'In determining whether a plaintiff is guilty of contributory negligence, when tested by demurrer on motion for a directed verdict, the question must be submitted to the jury if the facts are such that reasonable minds might reach different conclusions thereon.' "

See, also, *Beecher v. Stepanian,* 170 Kan. 201, 224 P. 2d 1017.

Appellee relies strongly upon *DeGraw v. Kansas City & Leavenworth Transportation Co.,* 170 Kan. 713, 228 P. 2d 527; and *Krey v. Schmidt,* 172 Kan. 319, 240 P. 2d 153. Both of these cases can be distinguished because they went to the jury and the points raised by argument of appellee need not be considered here. Of course, the Krey case also stated the above ground rules on demurrer to the evidence but appellee was directing his attention to other portions of the case. Likewise *Meng v. Penner,* 179 Kan. 789, 298 P. 2d 246, involved a demurrer to the petition and is not persuasive. Appellee argues many other authorities which no doubt will be applicable in the defense of this matter but should not be considered on a demurrer to the evidence.

The ruling on the demurrer to the evidence is reversed, the judgment thereafter rendered is set aside, and the cause is remanded for further proceedings.

It is so ordered.

SCHROEDER, J. (dissenting): In my opinion the plaintiff, Arley D. Haga, the appellant herein, has established by his evidence contributory negligence which was a proximate cause of the collision as a matter of law.

All of the evidence in this case presented by the plaintiff was in the nature of physical facts and circumstances, since there were no eye witnesses. The plaintiff himself by reason of a brain injury incurred a retrograde amnesia which impaired his recollection of the circumstances surrounding the collision in which he received his injury.

The factual situation presented by the record is important in this decision. Set forth in the most favorable light to the plaintiff, as the facts must be in ruling a demurrer to the evidence in accordance with the rules correctly set out in the majority opinion, they are as follows:

An improved gravel highway runs north of Eureka, Kansas, and at a point ten miles north turns one mile east, and then extends north four and one-half miles past what is known as the Burket Lease. This one mile stretch running east and west is twenty-six feet wide, marked in the center with a black center line with thirteen feet on each side. Upon the north half it has a windrow of gravel varying in width from four and one-half feet to six feet and in height from twelve to eighteen inches. This is the one mile stretch of road upon which the accident occurred.

Six and one-half miles to the northeast of the west intersection of this one mile stretch of road is Thrall where the Sinclair Lease is located.

The plaintiff, Arley D. Haga, was employed on the Burket Lease and lived at Eureka. For some period of time prior to the accident he drove over the one mile stretch of road in question twice each day. Other witnesses were employed on either the Burket Lease or the Sinclair Lease, and drove the one mile stretch of road in question at approximately the time the accident occurred. Approximately midway between the east and west intersections of this one mile is a driveway entering the Grooms residence to the

north. This driveway is used as a point from which distances are estimated and measured in connection with the accident and the use of the one mile stretch of road in question.

On the 12th day of January, 1954, that being the date of the accident, Edward E. Arnold, a witness who worked at the Sinclair Lease, left the lease at approximately 5:00 o'clock p. m. on said day. Arnold testified that he was proceeding in an easterly direction about forty to forty-five miles per hour and overcame the vehicle driven by Armstrong on the one mile east-west stretch of road heretofore described. At the time he came upon Armstrong he was driving about twenty miles per hour going east, driving part of the time on the left side and part of the time on the right side of the road; that it was necessary for him to continually sound his horn, shift the automobile into second gear and straddle the gravel windrow on the north side of the highway to overtake and pass the Armstrong vehicle, which would not pull over onto its proper side of the road. He saw Armstrong driving and his sister sitting in the front of the car and recognized them to be old people, and particularly recognized a cane between them. The point of passing was fifteen hundred feet east of the west intersection. After Arnold passed the Armstrong auto and about one thousand feet west of Grooms driveway he met the Baumgardner car coming from the opposite direction, and about five hundred feet east of Grooms driveway he met the Haga car also coming from the opposite direction. It was being driven by the plaintiff, whom he recognized. At the time of passing the Armstrong car the right side of his vehicle was only about twelve to fourteen inches from the left side of the Armstrong vehicle. At all times in question he could observe perfectly, the weather was clear and sunshiny and he had no difficulty seeing vehicles as they approached. He could see two vehicles coming from the east on this one mile east-west section of road.

Four persons worked on the Burket Lease and left at or near 5:00 o'clock on the day in question. The first to leave was Al Baumgardner who left about 5:00. With Baumgardner was riding John Runyan. The second was Merle Braymer who was driving a pick-up truck, and the third to leave was the plaintiff, Arley D. Haga. They all traveled over this one mile stretch of road in a westerly direction. Mr. Baumgardner drove approximately forty-five miles per hour for the entire distance, which was approximately

five miles to the scene of the accident. He first met the vehicle driven by Arnold and then met the vehicle driven by Armstrong about one thousand feet west of Grooms driveway. At that time he had to slow up and went a foot or more into the edge of the gravel windrow to play safe and avoid the Armstrong vehicle going in the opposite direction. The Armstrong vehicle was described as being pretty much on the witness's side of the road. Haga in traveling from the Burket Lease, overtook the vehicle driven by Braymer and met with the Armstrong vehicle where the accident occurred ninety-six feet west of the entrance to Grooms driveway. As a result of the accident Mr. Armstrong and his sister were killed and Mr. Haga was severely injured, which injury resulted in his having a complete loss of memory. About midpoint between the east intersection on this road and the point of the accident Braymer *saw* the two vehicles stopped ahead of him.

Specific reference is here made to the testimony of Charles B. Williams, Highway Patrolman, quoted in the majority opinion.

For clarity plaintiff's Exhibit 2 used in evidence which was drawn to scale, and described as correct by all the witnesses who were questioned concerning it, is set forth:

SCALE : 1" = 10'

NORTH

CENTER

ENTRANCE TO GROOMS RESIDENCE

SHOULDER OF ROADBED

MATERIAL

SOUTH SHOULDER OF ROADBED

SOUTH RIGHT OF WAY

30' skid H Gu

7' 10"

9.0'

2.0'

2.6'

All witnesses who testified said there was at least one-half mile of clear vision on this road.

This court will take judicial notice that a half mile is two thousand six hundred forty feet. This was the range of clear vision on the road in question in which Arnold at the time he overtook Armstrong west of Grooms driveway could see the Haga vehicle east of Grooms driveway. All the events heretofore related on this one mile stretch of road occurred at points between the location of Arnold and Haga as just related.

The driver of a motor vehicle upon a public street or highway is, in law, presumed to have seen and heard that which he could have seen and heard had he kept a proper look-out and exercised ordinary care and caution.

Haga, therefore, in law is charged with seeing everything that occurred as heretofore related on this one mile east-west stretch of road on the day of the accident. Haga was familiar with the road and knew there was a hazard by virtue of the windrow of gravel. He also knew that this windrow of gravel would, to some degree, prohibit or hinder him in turning to the right in order to give the oncoming driver the right of way which he was claiming.

The defendant presented his case in this court upon the admission that Armstrong was guilty of negligence. The defendant says:

"In the instant case there would appear to be little question but what Armstrong was guilty of negligence. He was crowding the center line and had been partially on the wrong side of the road during all the time that it had taken him to drive from the corner west to the place of the accident. . . ."

According to the witnesses, Armstrong's speed was from ten to twenty miles per hour, depending on the estimate of the particular witness.

The defendant demurred to the evidence of the plaintiff and the trial court sustained the demurrer. The sole question raised here is whether or not plaintiff by his own evidence is guilty of contributory negligence as a matter of law.

In the case of *DeGraw v. Kansas City & Leavenworth Transportation Co.,* 170 Kan. 713, 228 P. 2d 527, this court held:

"While as a general rule it may be said that a driver, absent knowledge to the contrary, may assume that an approaching vehicle will obey the rules of the road and thus get over and stay on its own side of the road, yet he will not be permitted to act on the assumption where the factual basis for it has disappeared, as for example, where it appears that the driver of such vehicle on the wrong side of the road either will not or cannot turn back to his own side.

"The purpose and object of rules of the road are to avoid accidents, but one is not justified in asserting his right to use his side of the road when, by not doing so, he can avoid a collision. The fact a motorist is on the proper side of the road does not entitle him to make an unreasonable use thereof nor relieve him of the duty to exercise due care to avoid injury to others, including those who may be on the wrong side of the road.

"It is the duty of every driver of a motor vehicle to keep a proper look-out at all times, the extent of such observation being dependent upon the conditions and circumstances then existing, such as weather, traffic, condition of the highway, special hazards, and the like, and not to drive at a speed greater than is reasonable and proper under such conditions, and at all times to use due care." (Syl. ¶ 4, 5, 6.)

In the *DeGraw* case the defendant's demurrer to the evidence was overruled and the defendant presented no evidence whatever. The case went to a jury without further evidence being presented by the defendant, and this court affirmed the ruling of the lower court on the ground that the contributory negligence of the decedent was a question in controversy and should go to the jury. There the parties are in the reverse position from the parties in the instant case. The next of kin of the decedent brought the action in the *DeGraw* case as plaintiffs, and in this case it is the administrator of the decedent that is being sued as a party defendant. This is material because the decision in the *DeGraw* case was based upon the fact that the contributory negligence of the decedent was a matter in controversy and for the jury to determine, while in this case the evidence of the plaintiff clearly established beyond any doubt the negligence of the decedent which is admitted by the defendant, the decedent's representative.

We thus have here presented clearly a situation which calls for the application of the law in the *DeGraw* case.

Applying all the rules applicable in connection with ruling a demurrer to the evidence, the plaintiff is charged in law with knowing that the decedent driver Armstrong was driving on both sides of the highway within a one-half mile range of vision before the two vehicles collided; that the Arnold vehicle had difficulty in passing the Armstrong vehicle by straddling the center of the gravel strip and that the Baumgardner vehicle had difficulty and was required to pull into the gravel windrow in meeting the Armstrong vehicle coming from the opposite direction. He is likewise charged with knowing that the east-west one mile stretch in question was divided by a black center line, upon which the evidence is uncontradicted, and that a gravel windrow approximately six feet wide at its widest

part occupied the north part of this highway in his lane of traffic; and that Armstrong was using not only all of the south half of the highway which was south of the black center line, but also a portion of that north of the black center line, at least part of the time, and that in so doing the driver Armstrong at his slow rate of speed was consistent in the negligent operation of his vehicle within a range of approximately one-half mile prior to the time the plaintiff met him.

The facts of the accident itself show that the vehicles of Haga and Armstrong collided with such speed and force that both occupants of the Armstrong vehicle were killed. And this force in colliding was sufficient after Haga had laid down thirty feet of skidmarks, with his vehicle three feet on the south side of the black center dividing line and the left wheels ten feet south of the south edge of the gravel windrow, to drive the Armstrong vehicle nine feet in the reverse direction killing both of its occupants.

The best evidence presented by the plaintiff was that approximately four-fifths of the front of each of the vehicles met head-on. The physical facts determined from the location of the vehicles at the time of the collision, also indicate that there was sufficient room for the plaintiff's vehicle to safely pass the Armstrong vehicle on its proper side of the black center line without driving onto or in the gravel windrow.

Cases similar on the factual situation to the instant case in which a demurrer to the evidence of the plaintiff was sustained are *Most v. Holthaus,* 170 Kan. 510, 227 P. 2d 144, and *Dolloff v. City of Wichita,* 147 Kan. 63, 75 P. 2d 221.

The contention of the appellant, in an effort to explain the location of the Haga vehicle, is that the center line of the road has shifted three feet to the south, since with six feet of the north lane being occupied by the gravel windrow, the remaining traveled portion of the roadway was only twenty feet wide. Our statute (G. S. 1949, 8-537) provides:

"Upon all roadways of sufficient width a vehicle shall be driven upon the right half of the roadway, except as follows: (1) When overtaking and passing another vehicle proceeding in the same direction under the rules governing such movement; (2) when the right half of a roadway is closed to traffic while under construction or repair;" . . .

The evidence is uncontradicted that there was sufficient room on the right half, between the black center line and the south edge of the gravel windrow, for the Haga vehicle to travel without using

the windrow to drive on. Further, no part of said road was closed to traffic as the gravel windrow could be used and was used for a passageway of vehicles at a reasonable rate of speed.

Even if it were assumed that the center line of the road shifted three feet to the south, Haga is charged with knowing that Armstrong claimed and was using all of that portion south of the black center line in regard to other vehicles using the highway.

Where both vehicles are crowding the center of the road, the case of *Fodor v. Interstate Transit Lines*, 149 Kan. 174, 86 P. 2d 574, explains the law of negligence in regard to the center of the road:

". . . The fact is that the wheels of each vehicle could be on the right side of the middle mark, but right up to it, and due to the part of each vehicle that extends beyond the wheels a collision such as we have here could have taken place . . . The fact is both drivers were negligent under the circumstances by being right up to the middle mark, regardless of which one crossed it."

This court further said in *Beecher v. Stepanian*, 170 Kan. 201, 224 P. 2d 1017:

"Driving a motor vehicle on the left-hand or wrong side of the highway in violation of G. S. 1947 Supp. 8-537, except under the circumstances provided in G. S. 1947 Supp. 8-538 and 8-540, proximately resulting in a collision with an oncoming motor vehicle on its right-hand side of the highway, is actionable negligence."

Even under this theory, regardless of what may have been the correct center line on the one mile stretch of road, both Armstrong and Haga *were crowding* the center line of what they may have regarded as their proper side of the road as taken from the location of the vehicles on the road at the point of impact and the testimony of plaintiff's witnesses.

The language of this court in the case of *Krey v. Schmidt*, 172 Kan. 319, 240 P. 2d 153, on facts reflecting negligence of the plaintiff which closely parallel the negligence of Haga is enlightening:

"Manifestly it is wholly unreasonable to assume appellee would have maintained his position in the center of his side of the highway without yielding an inch if he had seen the truck directly in front of him for a distance of 600 feet. The only rational conclusion that can be reached is that appellee did not look and did not see what the law holds him responsible for having seen when, in the exercise of reasonable care, he could have seen it. Just recently and in harmony with many past decisions it was held there can be no recovery where a person strikes a stopped motor truck in his lane of traffic which could have been seen in the nighttime from a distance of 300 feet and where there was nothing to prevent him from turning aside to avoid the collision. (*Bottenberg Implement Co. v. Sheffield*, supra [171 Kan. 67, 229 P. 2d 1004.])." (p. 328.)

Under all the facts and circumstances presented by the evidence of the plaintiff, giving full consideration to all laws applicable thereto, it is my opinion that reasonable minds could reach only one conclusion, and that was that Haga was negligent, which negligence was a proximate cause of the accident. This is especially true when the accident could have been avoided by Haga. He could have slowed down. He could have turned right and straddled the ridge of gravel, or he could have continued *in his own traffic lane* and the accident would never have occurred.

The judgment of the trial court should be affirmed, since in my opinion the demurrer to the evidence of the plaintiff was properly sustained.

PARKER, C. J., and PRICE, J., concur in the foregoing dissenting opinion.

WERTZ, J. (concurring specially): I concur in the decision of the majority and have no criticism of the opinion as written. However, I wish to supplement that opinion.

The general rule prevailing in this jurisdiction is that when a driver of a motor vehicle on a public highway is on his proper side of the road he has a right to presume the driver of a car approaching him from the opposite direction and on the lefthand or wrong side of the highway will get over on his proper side in time to avoid a collision, and, under such circumstances, does not have to anticipate that the driver of the other car will not do so. (Citing *Clark v. Southwestern Greyhound Lines,* 148 Kan. 155, 79 P. 2d 906.)

In *Smith v. Salts,* 170 Kan. 313, Syl. 1, 2, 224 P. 2d 1025, we held:

"Absent knowledge to the contrary a person has a right to assume the driver of a vehicle will observe the law of the road and turn to the proper side thereof when approaching another vehicle situated on its proper side of the road.

"Whether a person had knowledge the driver of a vehicle would not observe the law of the road, or in the exercise of reasonable diligence should have had such knowledge, presents a jury question whenever reasonable minds might differ on the subject."

In *Duncan v. Branson,* 153 Kan. 344, 350, 110 P. 2d 789, it was said:

"Defendant next argues that plaintiff was guilty of contributory negligence so as to preclude recovery, and his demurrer to the plaintiff's evidence should have been sustained. In the consideration of this argument we must give the evidence the most favorable consideration possible from the standpoint of the plaintiff. The plaintiff testified that he saw the light of the defendant's car for

the first time when it was about 450 feet east of him; that he was on the south side of the highway going about 25 miles an hour; that it looked as if it might be going to turn south and the next thing he knew it crashed into him; that he had not figured defendant was going to strike him until he 'plowed right into him.' There was evidence to the effect that defendant was driving on the wrong side of the highway. The foregoing was sufficient to make the question of whether plaintiff was guilty of contributory negligence one for the jury. The plaintiff was entitled to believe that the defendant would get back and remain on his own side of the highway as the cars approached each other. Had the car of defendant been on the proper side of the road at the time they met there would have been no collision. (See *Balano v. Nafziger*, 137 Kan. 513, 21 P. 2d 896; also, *Clark v. Southwestern Greyhound Lines*, 148 Kan. 155, 79 P. 2d 906; also, *McComas v. Clements*, 137 Kan. 681, 21 P. 2d 895.)"

One is bound to anticipate and guard against what usually happens or is likely to happen, but it would impose too great a burden to be held responsible for guarding against what is unusual or unlikely to happen and what may be said to be only remotely or slightly probable. (*Mehl v. Carter*, 171 Kan. 597, 603, 237 P. 2d 240.)

It is a well-established rule in this state that in determining whether a plaintiff is guilty of contributory negligence when tested by a demurrer, the question must be submitted to the jury if the facts of record are such that reasonable minds, in the exercise of fair and impartial judgment, might reach different conclusions thereon. Moreover, the question whether a negligent act is the proximate cause of an injury and whether an ordinarily reasonable and prudent man would have seen that injury might have occurred as the result of a negligent act is also a question for a jury.

In *Harshaw v. Kansas City Public Ser. Co.*, 154 Kan. 481, 485, 119 P. 2d 459, Mr. Chief Justice Dawson, speaking for this court, stated:

"It is argued that if plaintiff's testimony was accurate and given credence by the jury, the collision could not have happened, and that his testimony convicted himself of contributory negligence. It was defendant's privilege to press this line of argument on the attention of the jury, but it is beyond the province of an appellate court to sift the false or fallacious from the true, and deduce therefrom a conclusion that the jury's function should be dispensed with, and that such a controverted issue of fact as contributory negligence should be ruled on as a matter of law. It is only in clear cases which require no subtleties of reasoning that contributory negligence becomes a matter of law. (*Zumbrun v. City of Osawatomie*, 130 Kan. 719, 288 Pac. 584; id., 135 Kan. 26, 10 P. 2d 3; *Sponable v. Thomas*, 139 Kan. 710, 719-721, 33 P. 2d 721; also cases cited in Hatcher's Kan. Dig. 1623, and Supp. Dig. 375, 376.)"

The rule applicable to the instant case was stated in *Lawrence*

*v. Kansas Power & Light Co.*, 167 Kan. 45, 49, 204 P. 2d 752, wherein Mr. Chief Justice Harvey, speaking for this court stated:

"The legal questions here involved are so well settled in our law that they need not be labored. The actions were ones at common law in which plaintiffs sought damages alleged to have resulted from defendant's negligence, and defendant had pleaded contributory negligence of the plaintiffs. These are the kinds of actions in which each party is entitled to a trial by jury as a matter of right. They should not be converted into trials by the court. Negligence is the lack of due care. The instances are relatively rare when the facts are such that the court should say that as a matter of law the negligence alleged has been established. Before the court should make such a holding the evidence should be so clear that reasonable minds, considering it, could have but one opinion, namely, that the party was negligent. In these cases we think the contributory negligence of plaintiffs was clearly a question of fact for the jury. More than that, plaintiffs were not required to anticipate that with their car in the intersection defendant's bus would be driven into it and against their car at a speed of twenty-five to thirty miles per hour, with its driver not watching enough to know that the car was in the intersection. Under the evidence the jury might very well have found such acts of defendant to be the proximate cause of the injury."

The reasoning and the rules in the mentioned cases have been reasserted and cited with approval in our most recent cases. (*Thompson v. Barnette*, 170 Kan. 384, 387, 227 P. 2d 120; *Fry v. Cadle*, 171 Kan. 14, 17, 229 P. 2d 724; *Blankenship v. Fraker*, 173 Kan. 438, 441, 249 P. 2d 683; *Cain v. Steely*, 173 Kan. 866, 873, 252 P. 2d 909; *Siegrist v. Wheeler*, 175 Kan. 11, 15, 259 P. 2d 223; *Roehrman v. D. S. & O. Rural Electric Cooperative Ass'n*, 178 Kan. 52, 60, 283 P. 2d 411.)

In *Mehl v. Carter*, 171 Kan. 597, Syl. 3, 237 P. 2d 240, we stated:

"The question of negligence, including the determination of proximate cause, ordinarily rests in the province of the jury."

Mr. Justice Thiele, in speaking for this court, said in *Rowell v. City of Wichita*, 162 Kan. 294, Syl. 6, 176 P. 2d 590:

"The negligence charged must have been the proximate or legal cause of the injury, and what is the proximate cause is ordinarily a question for the jury."

See also *Emmerich v. Kansas City Public Service Co.*, 177 Kan. 443, 280 P. 2d 615; *Atherton v. Goodwin*, 163 Kan. 22, 180 P. 2d 296.

Many other cases of like effect may be found in 4 Hatcher's Kan. Dig. [Revised Edition], Negligence §§ 74, 75; and West's Kan. Dig., Negligence, § 136 (9), (25), (26).

The law favors trial by jury and the right should be carefully guarded against infringements. It is a right cherished by all free

people. A trial court, in the exercise of its prerogative in determining questions of law only in these kinds of cases, should not usurp the power and function of the jury in weighing evidence and passing upon questions of fact. In the instant case, I am of the opinion that plaintiff's evidence presented a situation where reasonable minds might differ as to just who was negligent and whose negligence, if any, was the proximate cause of the injury complained of, and hence was clearly a question to be presented to the jury.

ROBB and FATZER, JJ., concur in the foregoing specially concurring opinion.